In re GRAND JURY PROCEEDINGS
the BANK OF NOVA SCOTIA.

UNITED STATES of America,
Plaintiff-Appellee,

v.

The BANK OF NOVA SCOTIA,
Defendant-Appellant.

Nos. 83–5708, 84–5198.

United States Court of Appeals,
Eleventh Circuit.

Aug. 14, 1984.

Griffin B. Bell, King & Spalding, Charles H. Kirbo, James A. Pardo, Jr., Atlanta, Ga., Danforth Newcomb, Shearman & Sterling, Henry Harfield, Roberta Bender, New York City, William E. Sadowski, Akerman, Senterfitt & Eidson, Miami, Fla., for defendant-appellant.

Herschel E. Sparks, Jr., Sage, Gray, Todd & Sims, Miami, Fla., Robert W. Brundige, Jr., New York City, for amicus curiae, The Canadian Bankers Ass'n.

Stanley Marcus, U.S. Atty., Thomas A. Blair, Linda Collins Hertz, Lawrence H. Sharf, Andrea M. Simonton, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Andreas F. Lowenfeld, New York City, for the Government of Canada.

Parker D. Thomson, Thomson, Zeder, Bohrer, Werth, Adorno & Razook, Cloyce L. Mangas, Jr., Miami, Fla., for amicus curiae, The Cayman Islands, United Kingdom and Northern Ireland.

Before FAY and ANDERSON, Circuit Judges, and BOYLE [*], District Judge.

FAY, Circuit Judge:

This case is an appeal by the Bank of Nova Scotia, ("The Bank"), of an order of civil contempt and the imposition of a $1,825,000 fine entered by the United States District Court for the Southern District of Florida. On numerous occasions the district judge ordered the Bank to comply with a grand jury subpoena *duces te-*

---

[*] Honorable Edward J. Boyle, Sr., U.S. District Judge for the Eastern District of Louisiana, sitting by designation.

*cum.* The Bank continuously disregarded the court's orders. The district judge concluded that the Bank did not act in good faith and found it in contempt of court. He imposed a $25,000 per day fine for as long as the Bank did not comply with the subpoena. The Bank challenges the order on various diplomatic and legal grounds. After a careful review of the record we conclude that the district judge was extremely patient. He did not abuse his discretion in finding the Bank in contempt of court and imposing the fine.

## I. FACTS

The Bank of Nova Scotia is a Canadian banking corporation, headquartered in Toronto, with over 1,200 branches, offices and agencies in forty-six countries. On March 4, 1983, the Bank's Miami office was served with a grand jury subpoena *duces tecum* issued by the United States District Court for the Southern District of Florida. The subpoena called for the production of financial documents pertaining to two individuals and three companies from the Bank's branches in the Bahamas, the Cayman Islands and Antigua.[1] On March 22, 1983, the Bank's Miami office sent telexes to the Bahamian and Cayman branches informing them of the subpoena and asking them to search for the requested documents. The Bank produced no documents at its March appearance before the grand jury. On April 4, 1983, the Bank filed a

motion to quash in the district court asserting that if it complied with the subpoena it would violate the secrecy laws of the Bahamas and the Cayman Islands.[2] The court denied the motion and ordered the Bank to produce the documents by May 31, 1983.

During the month of May the Bank made no effort to comply with the court's order by searching for the subpoenaed documents. Instead the Bank spent its time corresponding through counsel with the Assistant United States Attorney handling the grand jury proceedings. The Bank continuously requested the government to send letters rogatory and to show the materiality and necessity of the subpoenaed documents to the grand jury investigation. The government repeatedly stated that it was willing to provide any requested assistance, short of showing materiality and necessity or sending letters rogatory.

The only other effort by the Bank during the month of May to comply with the district court's order was the filing of a petition before the Grand Court of the Cayman Islands for permission to disclose the documents sought in the subpoena. The Grand Court denied the petition on May 31, 1983, but granted the Bank leave to renew it at a later date. The Court further ordered the Bank not to produce the subpoenaed documents. The Bank never appealed this order to the Court of Appeals in Jamaica.

---

1. The Bank investigated and found none of the requested documents at its Antigua branch. Therefore, that part of the subpoena is not at issue. The individuals and corporations named in the subpoena are Frank Brady, Paula Brady, Frank J. Brady Enterprises, Inc., Brady Farms, Inc., and Clay Island Farms, Inc.

2. The relevant section of the confidentiality law of the Cayman Islands reads as follows:

 3A. (1) Whenever a person intends or is required to give in evidence in, or in connection with, any proceeding being tried, inquired into or determined by any court, tribunal or other authority (whether within or without the Islands) any confidential information within the meaning of this Law, he shall before so doing apply for directions and any adjournment necessary for that purpose may be granted.
 (2) Application for directions under subsection (1) shall be made to, and be heard and

determined by, a Judge of the Grand Court sitting alone and *in camera.* At least seven days' notice of any such application shall be given to the Attorney General an, if the Judge so orders, to any person in the Islands who is a party to the proceedings in question. The Attorney General may appear as *amicus curiae* at the hearing of any such application and any party on whom notice has been served as aforesaid shall be entitled to be heard thereon, either personally or by counsel.
Section 3A(1)–(2) of the Confidential Relationships (Preservation) Law of 1976 (as amended in 1979).
The Bank concedes, on page eight of its supplemental brief, that the Attorney General of the Bahamas authorized the Bank to release the documents prior to the time the contempt sanction became effective. Thus, the Bahamian documents "are not at issue in this appeal."

On June 1, 1983, the Bank filed another motion for relief from the subpoena in the district court. The court denied the motion on October 10, 1983, and ordered the Bank to comply with the subpoena by October 17, 1983, or face a contempt hearing on October 21, 1983. The Bank's only effort to locate any documents either in the Bahamas or in the Caymans between the June first motion and scheduled October hearing was a search conducted in Nassau on October 14, 1983, which produced no documents. The only document produced by the Bank during this seven month period was a xerox copy of a draft[3] drawn to Paula Brady by the branch in Nassau for $163,892.33. At the hearing the district court concluded the Bank had not made a good faith effort to comply with the subpoena and found it in contempt. The court imposed a fine of $25,000 per day, beginning on October 26, 1983, and continuing until the Bank complied with the subpoena or the grand jury expired. We stayed the fine from October 25, 1983 until November 14, 1983.

On November 11, 1983, the Attorney General of the Bahamas issued an order allowing the Bank to produce the requested documents. He concluded that since the Bahamian branch did not have an account relationship with the subjects of the subpoena the dealings of the parties in the Bahamas were not protected by the Bahamian bank privacy statute. On November fourteenth, just prior to the lifting of the stay of the $25,000 per day fine imposed by the district court, the Bank delivered the following documents from its Bahamian branches:

Copies of the following Certificates of Deposit:
a) CD 6511601 issued on March 2, 1979, for $50,000 payable to Paula or Frank Brady.
b) CD 6511799 issued on March 2, 1979, for $50,000 payable to Paula or Frank Brady.
c) CD 6511800 issued on March 2, 1979, for $50,000 payable to Paula or Frank Brady.
Draft requisition dated November 8, 1982, by Paula Brady drawn on Manufacturer's Hanover in New York for $163,892.33.
Nassau branch copy of the draft requisition of November 8, 1982.
Receipt dated November 8, 1982, signed by Paula Brady.

After this disclosure the Assistant United States Attorney insisted that there were Bahamian documents still missing. The Bank reiterated that all of its branches in Nassau had been searched and there were no other documents in the Bahamas.

On November 11, 1983, the Grand Court of the Cayman Islands reconsidered the issue of disclosure and again refused to permit the Bank to disclose the records. However, the Governor of the Islands, pursuant to Section 3(2)(b)(iv) of the confidentiality statute,[4] authorized the disclosure of the subpoenaed documents on November 17, 1983. The Bank immediately produced all of the documents which had been located at the Cayman branch of the Bank. Once again the Assistant United States Attorney reiterated that a substantial number of documents still had not been produced from the Bahamian branches in spite of the ruling by the Attorney General of the Bahamas permitting disclosure.[5]

---

**3.** A draft in the Bahamian islands is the same thing as an American cashier's check.

**4.** Section 3(2)(b)(iv) of the Confidential Relationship (Preservation) Law of 1976 (as amended in 1979) states:
(2) This law has no application to the seeking, divulging, or obtaining, of confidential information—...
(b) by or to ...
(iv) the Financial Secretary, the Inspector or, in relation to particular information specified

by the Governor, such other person as the Governor may authorise; ....

**5.** Of the $1,825,000 fine imposed by the district court, only $100,000 is attributable to the failure to produce records from both the Bahamas and the Cayman Islands. The remainder of the fine is imposed solely because of the failure to produce the Bahamian records until January 25, 1984. There was absolutely no question whatsoever concerning the Bahamian records after November 11, 1983.

In late November, 1983, Mr. Nicol, the assistant chief inspector for the Bank, was ordered to go to the Bahamas and "insure that [an] effective search had been carried out of the Bank's records in the Bahamas." Mr. Nicol arrived in Nassau on November 24, 1983, and immediately discovered additional documents in two of the Bank's Bahamian branches.[6] As a result of his search photocopies of the following items were turned over on December 5, 1983:

Composite 1: CD 1093134 dated January 11, 1979, for $20,000.

The register copy of this CD.

The diary debit copy showing that it was paid on April 11, 1979.

Composite 2: CD 1093357 dated April 11, 1979, for $20,542.46.

The register copy of this CD.

The auditor's copy of this CD.

Composite 3: CD 1093181 dated January 31, 1979, for $50,000.

The register copy of this CD.

Composite 4: CD 1093300 dated March 20, 1979 for $200,000.

The register copy of this CD.

Composite 5: CD 1093329 dated March 28, 1979, for $150,000.

The register copy of this CD.

The auditor's copy of this CD.

Composite 6: Draft sold to Paula Brady payable to Brady Farms for $100,000 on January 11, 1979.

Requisition for the draft.

Composite 7: Draft sold to Frank Brady payable to Brady Farms for $200,000 on February 23, 1979.

Requisition for the draft.

Composite 8: Draft sold to Frank Brady payable to Brady Farms for $40,000 on February 23, 1979.

Requisition for the draft.

Composite 9: Draft for $225,000 sold on March 19, 1979, payable to Brady Farms.

Requisition for the draft.

Composite 10: Draft sold to Frank Brady payable to Clay Island Farms for $250,000 sold on April 18, 1979.

Requisition for the draft.

Prior cancelled requisition for the draft.

Composite 11: Draft sold to Frank Brady payable to Calleaders Orr and Company for $170,000 sold on April 18, 1979.

Requisition for the draft.

Prior cancelled requisition for the draft.

The following other items were also produced on December 5, 1983:

Operation of Foreign Currency Deposit Account dated January 11, 1979, signed by Paula and Frank Brady.

Bank Form 702: Current Account document and operating record.

Several checking account statements.

Deposit slip dated March 20, 1979 and a credit memo with the same date.

Deposit slip and credit memo dated April 12, 1979.

Deposit slip and credit memo dated April 18, 1979.

A credit to the bank commission account for $1,191.90 for a handling charge.

Three checking account statement for West Indies Island Tourist Company, LTD.

Checking account statement in the F.N. Bowe "U.S. Dollar" account.

On December 9, 1983, the Assistant United States Attorney informed the Bank that he needed a Bank employee to appear before the grand jury on December 20, 1983, to authenticate all of the documents that had been produced. The government's attorney reminded the Bank that only copies of the documents had been produced and requested that the authentication witness bring the originals. The Bank decided that it would send Mr. Nicol to appear before

---

**6.** Mr. Nicol began his search by opening a sealed list of dormant accounts which revealed one of the target names on the subpoena. He noticed that all of the 1979 records appeared to be missing. He then ordered a physical search of the archives room which revealed a box of vouchers with no label. This box held most of the items requested in the subpoena.

the grand jury but did not notify him until December nineteenth. As a result of the Bank's delay, his appearance before the grand jury was rescheduled for January 24, 1984.

We heard oral argument on the expedited appeal on December 12, 1983. Since much had transpired during the pendency of the appeal we remanded the case to the district court for further proceedings [7] and retained jurisdiction. *In re Grand Jury Proceedings, United States v. The Bank of Nova Scotia*, 722 F.2d 657 (11th Cir.1983).

In January, Mr. Nicol began preparing for his appearance before the grand jury. While reviewing the documents he realized that a number of vouchers were still missing. He once more contacted the Bahamian branches and requested that the boxes of records be searched. On January 23, 1983, the Bank found additional documents in the Bahamas. The following documents,[8] along with the original of the draft produced on October 20, 1983, were delivered on January 25, 1984:

Four vouchers of the CDs redeemed on April 18, 1979.

Cancelled draft 184901 dated November 8, 1982, to Paula Brady for $163,892.33 drawn on the Bank in Nassau and deposited to the F.N. Bowe "U.S. Dollars" account in Nassau.

Diary debits to GL at maturity for:
CD 1093300 in the amount of $220,000
CD 1093329 in the amount of $150,000
CD 1093181 in the amount of $50,000

CD 1093357 in the amount of $20,-542.46

The hearing on remand was held on February 14, 1984. Most of the evidence introduced by the Government at the hearing consisted of affidavits.[9] They also submitted the transcript of Mr. Nicol's appearance before the grand jury. The documentary evidence presented by the government was letters from the Bank's counsel transmitting some of the subpoenaed documents. The government called only one witness, Norman Washington Hill, a member of the Bar in England, and an attorney in the Cayman Islands since 1970.[10]

The Bank called three witnesses, Mr. Nicol, Mr. Richard John Marshall, an attorney at law in the Cayman Islands, and Mr. Scott McDonald, the vice-chairman of the Bank's Board of Directors. Its documentary evidence consisted of its petitions before the Grand Court of the Caymans, the letters to the branches requesting assistance and a chart comparing the documents produced on December 5, 1983, with those produced on January 25, 1984.

We had ordered the parties to present evidence to the district court of the letter agreement between both countries first mentioned to us during oral argument in December. The Bank introduced these letters, known as the "Gentlemen's Agreement", which reflected the results of a meeting between the Cayman Islands and the United States held in Miami in September, 1982. After the meeting, Acting Governor of the Caymans, D.H. Foster, wrote a

---

**7.** We remanded the case for several reasons. During oral argument the bank asserted that it had fully complied with the subpoena and the government disagreed. We found out there existed a Single Convention on Narcotic Drugs (1961) signed by both the United States and the Cayman Islands and a letter agreement between the officials of both countries that allegedly controlled this situation. Neither of these agreements was brought to the attention of the trial judge. In addition, the views of various *amici, i.e.,* the government of Canada, the Canadian Bankers' Association, the United Kingdom of Great Britain and Northern Ireland and the Cayman Islands, were never presented to the district court at the first proceedings.

**8.** The Bank asserts that these documents were identical in content to the documents produced by the Bank on December 5, 1983. The vouchers submitted to the government on January 24, 1984, were one copy of a four-part form, but once the form is separated each part acquires different markings on its independent routing through the Bank.

**9.** Although the Government had all of the witnesses whose affidavits had been submitted to the court present in the courtroom, the Bank chose not to cross-examine any of them.

**10.** Mr. Hill has been employed by the United States Department of Justice since 1982 to represent its interests in the Cayman Islands.

letter to Michael Carpenter, the Consul General of the United States in Jamaica, outlining the necessary steps to be followed by the United States when requesting information protected by the confidentiality laws of the Caymans. Requests for assistance would be

(1) initiated through the office of International Affairs of the United States Department of Justice;

(2) directed to the Cayman Islands Commissioner of Police and supported by documentary evidence and affidavits sufficient to establish that the requests were in connection with inquiries into an offense made criminal by both the laws of the United States and the Cayman Islands, with tax offenses specifically excluded;

(3) received by the Police Commissioner who would first determine whether a *prima facie* case was evident and if so would be referred to a committee consisting of the Attorney General, the Financial Secretary, a senior member of the police force and an elected member of the Executive Council;

(4) examined by that Committee and forwarded with a recommendation to the Governor in Council for presentation to the Council at its next weekly meeting;

(5) reviewed by the Governor in Council, and if the recommendation of the Committee were approved, the Governor would authorize the confidential information or records to be obtained for the Governor in Council; and the information

(6) forwarded through the Police Commissioner to the United States Office of International Affairs after perusal by the Governor in Council.

Foster predicted the information would be produced within one month of the request.[11] He concluded his letter by saying: "I should be obliged for confirmation that this is your Government's understanding...."

The United States Government never confirmed the agreement. Instead, Deputy Assistant Attorney General, Roger M. Olsen, wrote a letter dated January 11, 1983, to its Excellency, G.P. Lloyd, C.M.G., Governor of the Cayman Islands stating:

... I do wish to reiterate that while we are willing to try out the proposed procedures, the United States retains the option of relying on other legal processes available to us in gathering evidence. Such processes include our seeking the issuance of orders from our own courts commanding the production of evidence from persons or institutions in our territory.

... [W]e do have several reservations about whether the proposed procedures satisfactorily address both our Governments' needs.

In response to Mr. Olsen's letter, Governor Lloyd wrote a letter to Mr. Carpenter on March 15, 1983. The Governor stated that "even though no confirmation had been received from your Government as to the agreed procedures, they would be implemented by us."

The *amici* all filed extensive briefs with the district court. At the hearing they very briefly presented their views to the court on the diplomatic ramifications of the case. *Amici* offered no evidence whatsoever. On February 28, 1984, the district court issued its order, reaffirming its conclusion that the enforcement of the grand jury subpoena was proper and that the Bank had not acted in good faith. The court found the total fine due and owing the United States to be $1,825,000.00.

The Bank challenges the district court's contempt order by claiming that it made a good faith effort to comply with the court's orders in its search for the requested documents. It also asserts that both the diplomatic agreements between these countries

---

**11.** John Harris stated in his affidavit that "no bank records have ever been received in any case by the United States in the fourteen months that the informal agreement has been under experiment...."

and the act of state doctrine require reversal of the court's contempt order and fine. We disagree.

## II. PRODUCTION OF DOCUMENTS

### A. Lack of Good Faith

The Bank of Nova Scotia was served with a subpoena from the grand jury on March 4, 1983. The Bank produced no documents at its March appearance before the grand jury and instead moved to quash the subpoena. The district court gave the Bank two months to search for the documents and ordered production by May 31, 1983. Instead of trying to comply with the district court's order during this time the Bank spent most of its time corresponding through counsel with the Assistant United States Attorney handling the case. The Bank insisted that the government send letters rogatory and show the materiality and necessity of the requested documents to the investigation. Neither of these is a prerequisite to the enforcement of a grand jury subpoena in our legal system.

Under our system of jurisprudence the grand jury's function in investigating possible criminal violations is vital. *In re Grand Jury Proceedings, United States v. Bank of Nova Scotia*, 691 F.2d 1384 (11th Cir.1982), *cert. denied sub nom, Bank of Nova Scotia v. United States,* — U.S. ——, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *In re Grand Jury Proceedings, United States v. Field*, 532 F.2d 404 (5th Cir.1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976). The Supreme Court has stated that "the grand jury's authority to subpoena witnesses is not only historic, *id.* [*Blair v. United States*, 250 U.S. 273] at 279–281 [39 S.Ct. 468 at 470–471, 63 L.Ed. 979 (1919)], but essential to its task." *Branzburg v.*

*Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 643 (1972). Since the ability to obtain evidence is crucial to all criminal justice proceedings, courts have repeatedly allowed the grand jury wide discretion in seeking evidence. *See, United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

 It would be extremely unwise for us to unduly restrict the broad investigatory powers of the grand jury by first requiring that the government show necessity or issue letters rogatory. Letters rogatory are not equivalent to a grand jury subpoena. *See, United States v. Vetco, Inc.*, 644 F.2d 1324 (9th Cir.1981). We have clearly stated that the government is not required to show the relevancy of the requested documents to a grand jury investigation,[12] *In re Grand Jury Proceedings, United States v. Bank of Nova Scotia*, 691 F.2d at 1387; *In re Grand Jury Proceedings, United States v. Guerrero*, 567 F.2d 281 (5th Cir.1978); *In re Grand Jury Proceedings, United States v. McLean*, 565 F.2d 318 (5th Cir.1977),[13] and we have repeatedly declined requests to overturn this rule. *In re Grand Jury Proceedings, United States v. Nigel Bowe*, 694 F.2d 1256, 1258 (11th Cir.1982); *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir.1982). As noted by the Supreme Court:

> Any holding that would saddle a grand jury with mini-trials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws.

*United States v. Dionisio*, 410 U.S. at 17, 93 S.Ct. at 773.

---

12. We are all aware that the Third Circuit in its holdings in *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85 (1973) and *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963, *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975) has imposed a relevancy requirement but we have already stated that we refuse to impose such a restriction. *In re Grand Jury Proceedings, United States v. Bank of Nova Scotia*, 691 F.2d 1384, 1387 (11th Cir.1982). We join the other circuits that have declined to

adopt such a rule. *See, e.g., In re Pantojas*, 628 F.2d 701 (1st Cir.1980); *In re Liberatore*, 574 F.2d 78 (2d Cir.1978).

13. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding upon this court unless and until they are overruled by the Eleventh Circuit sitting *en banc*. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*).

■ The district court correctly concluded that the Bank failed to exercise good faith in its efforts to comply with the subpoena. All the Bank tried to do in this case was to obtain from the government what it was clearly not entitled to receive; a showing of materiality and necessity and the issuance of letters rogatory. The district court specifically ruled that letters rogatory were not required yet the Bank continued to write to the prosecutor requesting him to send letters rogatory. Nothing was substantially done by the Bank until the $25,000 per day fine imposed by the district court started to accumulate.

The documents actually produced at different times virtually speak for themselves in showing lack of good faith. On October 20, 1983, seven months after the grand jury subpoena had been served, the only document produced by the Bank was a xerox copy of a draft drawn to Paula Brady for $163,892.33. The Assistant United States Attorney advised Bank's counsel that there were many more documents in existence which were responsive to the subpoena. Nevertheless, the Bank blithely ignored these warnings and on November 14, 1983, tendered copies of the documents relating to that one transaction as the only records in the Bahamian branches called for by the subponea. The prosecutor once more warned the Bank that he considered the production inadequate. The Bank insisted that they had diligently searched all ten branches in the Bahamas and had produced all documents. On November 17, 1983, the Bank turned over all of its records from the Cayman Islands. The IRS agent working on the case once more warned Bank's counsel that there were many more documents sought by the subpoena which the Bank had not produced.

Having chosen to ignore all warnings until the fine had started to accumulate, the Bank belatedly became concerned and ordered Mr. Nicol, in late November, 1983,

to go to the Bahamas and insure that an effective search had been carried out. Nicol's search began in obvious places which had been previously ignored or overlooked. As a result of his efforts numerous additional documents were discovered at two of the Bank's Bahamian branches. Nine months after the original service of the subpoena, on December 5, 1983, the Bank produced photocopies of voluminous records from 1979. While examining the original documents from the December fifth turnover Mr. Nicol discovered that there were other documents which obviously still were missing. He requested another search of the box of records and obtained the missing documents. These documents were produced on January 25, 1984.

■ The flurry of activity undertaken by the Bank to discover documents after the trial court entered its order of contempt cannot save the Bank from the consequences of its previous extensive pattern of delay. *See, e.g., United States v. Work Wear Corp.,* 602 F.2d 110 (6th Cir.1979). It is clear that the Bank had ample time to search its records and fully comply with the grand jury subpoena at least between April 27, 1983, when the trial court first ordered compliance, and November 14, 1983, when the fines began accumulating. The fact that the Bank at first may have believed erroneously that Bahamian law precluded disclosure, does not excuse the Bank's failure to perform a diligent search upon receipt of the trial court's order of enforcement. If the Bank had done so, it would have been able to avoid the fine with respect to the Bahamian documents by producing them all, rather than just a small fraction of them, on November 14, 1983.

B. Balancing Competing Interests

The Bank also asserts that compliance with the United States grand jury subpoena would require it to violate the Cayman Islands secrecy laws.[14] It therefore con-

---

**14.** Most of the arguments raised by the Bank and *amici* challenge the contempt order against the Bank for failure to produce records from the Cayman Islands yet almost the entire fine imposed is attributable solely to the Bank's delayed production of records from the Bahamas. The Bank does not contest the validity of the underlying contempt order as it applies to the

tends that it would be appropriate for the United States to moderate the exercise of its judicial enforcement powers in this case since the conflicting laws impose inconsistent obligations on the Bank. The district court, balancing the several factors enumerated in Section 40 of the Restatement (Second) of Foreign Relations Law of the United States (1965), properly concluded that enforcement of the subpoena was proper.

Section 40 provides:

Limitations on Exercise of Enforcement Jurisdiction

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as:

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Restatement (Second) of Foreign Relations Law of the United States (1965).

The first Restatement factor is the relative interest of the states involved. In this case, the United States seeks to obtain information concerning the money transactions of individuals who are the target of a narcotics investigation. Stemming the narcotics trade has long been a concern of paramount importance to our nation. Congress has steadily enlarged the means available for the detection, prosecution and punishment of those who violate the narcotics laws of this country. *Gore v. United States,* 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958). Illegal narcotics trade generates enormous amounts of cash. Tracing the flow of these dollars is indispensable to this nation's efforts to stop the narcotics trade. Congress, as well as the Executive Branch, has long been "concerned about [the] serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax and regulatory enactments." *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 27, 94 S.Ct. 1494, 1501, 39 L.Ed.2d 812 (1974). *See also,* H.R.Rep. No. 91–975, 91 Cong.2d Sess. 12 (1970), U.S.Code Cong. & Admin.News 1970, 4394, 4397.

■ The Cayman Islands, on the other hand, sees preservation of bank secrecy as vital to the expansion of the Island's principal industry-banking and off-shore finance. Yet the law does not operate as a blanket guarantee of privacy and has many exceptions.[15] As the Court of Appeal in Jamaica has stated:

It would therefore appear that the policy of the legislature is that the Confidentiality Laws of the Cayman Islands should not be used as a blanket device to encourage or foster criminal activities....

refusal to produce the documents from its Bahamian branches so we will discuss only the Cayman records.

**15.** Disclosure may be made whenever authorized by the Grand Court, or "in the normal course of business," or with the "express or implied consent" of the "relevant principal," or "by or to" a constable investigating offenses in the jurisdiction, or "by or to" a constable investigating certain offenses alleged to have been committed abroad, or "by or to" the Financial Secretary, the Inspector or anyone else authorized by the

Governor, or "by or to" a professional person where "necessary for the protection of himself or any other person against crime," or in accordance with the provisions of "any other law." Confidential Relationships (Preservation) Law § 3. The statute does not restrict the power of the Grand Court in ruling upon applications. In a criminal case for which an application for disclosure is made, the judge is merely instructed to "have regard to" the "interests of justice." *Id.* § 3A(6)(c).

[T]here is nothing in the statute to suggest that it is the public policy of the Cayman Islands to permit a person to launder the proceeds of crime in the Cayman Islands, secure from detection and punishment.

*In re Confidential Relationships (Preservation) Law, United States v. Carver,* (Jamaica Ct.App.1982) (Joint Brief of the United Kingdom and the Cayman Islands, Appendix L.) Furthermore, even if the Cayman Islands had an absolute right to privacy, this right could not fully apply to American citizens. The interest of American citizens in the privacy of their bank records is substantially reduced when balanced against the interests of their own government engaged in a criminal investigation since they are required to report those transactions to the United States pursuant to 31 U.S.C. § 1121 and 31 C.F.R. § 103.24 (1979).[16] *United States v. Payner,* 447 U.S. 727, 732 and n. 4, 100 S.Ct. 2439, 2444 and n. 4, 65 L.Ed.2d 468 (1980).

We agree with the district court that the Bank suffered no hardship as a result of inconsistent enforcement actions. The Bank and the *amici* argue that it is unfair to require the Bank to be put in the position of having to choose between the conflicting commands of foreign sovereigns. Yet such occasions will arise and a bank indeed will have to choose. As we stated in *In re Grand Jury Proceedings United States v. Field,* 532 F.2d 404, 410 (5th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976):

In a world where commercial transactions are international in scope, conflicts are inevitable. Courts and legislatures should take every reasonable precaution to avoid placing individuals in the situation [the Bank] finds [it]self. Yet, this court simply cannot acquiesce in the proposition that United States criminal investigations must be thwarted whenever there is conflict with the interest of other states.

Consideration of the other factors set forth by the Restatement does not alter our conclusion that the district court properly enforced the subpoena and imposed contempt sanctions. The disclosure to the grand jury would take place in the United States. The foreign origin of the subpoenaed documents should not be a decisive factor.[17] The nationality of the Bank is Canadian, but its presence is pervasive in the United States.[18] The Bank has voluntarily elected to do business in numerous foreign host countries and has accepted the incidental risk of occasional inconsistent governmental actions. It cannot expect to avail itself of the benefits of doing business here without accepting the concomitant obligations. As the Second Circuit noted years ago, "If the Bank cannot, as it were, serve two masters and comply with the lawful requirements both of the United States and Panama, perhaps it should surrender to one sovereign or the other the privileges received therefrom." *First National City Bank of New York v. Internal*

---

**16.** The interest of the Cayman Islands in protecting the privacy of bank customers is also diminished here since the investigating body is a federal grand jury which is required by law to maintain the secrecy of its proceedings. *See, United States v. Vetco,* 644 F.2d 1324, 1331 (9th Cir.1981); Fed.R.Crim.P. 6(e).

**17.** The Government of Canada vigorously asserted that the situs of the records is of utmost significance and that, absent extraordinary circumstances, the law of the jurisdiction must prevail. This position is advanced only in a tentative draft of the revised Restatement and does not reflect the current law of the United States. *See, e.g., In re Grand Jury Proceedings, The Bank of Nova Scotia,* 691 F.2d 1384 (11th Cir.1982); *United States v. Field,* 532 F.2d 404

(5th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976). The position advanced by the tentative draft has been explicitly rejected by the State Department. *See, e.g.,* Compelling Discovery and Evidence in International Litigation, Address of Honorable Davis R. Robinson, The Legal Advisor, U.S. Department of State before the Association of the Bar of the City of New York (February 14, 1984).

**18.** The Bank of Nova Scotia has branches in Boston and Portland, agencies in Atlanta, Miami, New York and San Francisco, representative offices in Chicago, Cleveland, Houston, and Los Angeles, and a wholly-owned subsidiary, Bank of Nova Scotia Trust Company of New York.

*Revenue Service*, 271 F.2d 616, 620 (2d Cir.1959), *cert. denied*, 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960).

■ Enforcement of the subpoena is consistent with the grand jury's goals of investigating criminal matters. It is also entirely consistent with the Cayman policy against the use of its business secrecy law "to encourage or foster criminal activities." In the Matter of Proceedings Pending in the United States District Court for the District of Columbia between United States of America and Ray R. Carver, et al., (Ct. of Appeal, Jamaica 1982) quoted in Joint Brief of the United Kingdom and the Cayman Islands at 26–27. We conclude that enforcement of the subpoena and the sanctions imposed in this case are proper under the balancing approach of Section 40.

## III. THE GENTLEMEN'S AGREEMENT

■ *Amici,* United Kingdom and the Cayman Islands, contend that the subject subpoena should not be enforced because the United States is bound to follow the procedure developed as a result of a September 27, 1982, meeting and exchange of letters between the United States and Cayman Islands. The *amici* assert that this new procedure, called the gentlemen's agreement, was a precondition to enforcement of the grand jury subpoena. After considering the briefs and arguments of the parties and *amici*,[19] and reviewing the uncontroverted affidavits of the United States the district court found:

> [The letters exchanged between the United States and Cayman Islands] do not constitute any formal inter-governmental agreement. While the Cayman government may have manifested an intent to be bound to the agreed procedures, the United States government clearly did not. Additionally, the Cayman Governor was not under the impression that the United States intended to be bound by the procedures.

Supp. Record at 346.

Based upon this finding, the district court concluded:

> The letter agreements did not result in and in and of themselves do not constitute a contract by which the United States is bound. Even if the "gentlemen's agreement" was binding, it would not have required any course of action different from that which the government took in this case. By its terms, it did not require the government to resort first to the outlined procedures or to forfeit the prerogatives of the United States Attorney with respect to grand jury investigations. The "gentlemen's agreement" was not a means by which this Court could have properly required the government to reveal to the Bank or the Cayman government the materiality and necessity of the subpoenaed documents to the grand jury investigation. In other words, the government did not bargain away its rights under *McLean* [565 F.2d 318] and its progeny to maintain the secrecy of the investigation.

The district court's interpretation of the gentlemen's agreement procedure is the only rational interpretation supported by the record. The testimony and the letters reveal only preliminary negotiations with a hope of reaching a definite agreement in the future.[20] The March 15, 1983, letter from Governor Lloyd to Consul General Michael Carpenter makes this clear. Governor Lloyd clearly indicated the decision of the Cayman Islands to implement the working procedures even though no confirmation had been received from the United States as to the procedures. It is clear from the evidence presented to the district court that this exchange of letters was not a binding, enforceable agreement but rath-

---

**19.** Although the *amici* were very verbose in their briefs we were surprised that they presented no documents or evidence to the district court when dealing with the serious legal questions involved in this case.

**20.** Deputy Assistant Attorney General Roger Olsen's affidavit avers that it "would have been in direct contradiction to the authority granted to me and our delegation" to enter into a binding agreement on September 27, 1982. Government Exhibit 3 at 5. *Amici* did not controvert this assertion.

er an experimental and tentative alternative for the production of documents.

Further, the gentlemen's agreement did not purport to limit the existing law enforcement investigatory methods used by the United States—such as the grand jury subpoena. On the contrary, each of the United States witnesses refuted this assertion. Government's Exhibits 2, 3 and 4. The January 11, 1983, letter from Deputy Assistant Attorney General Roger Olsen to Governor Lloyd, specifically rejected any such interpretation by stating:

> However, I do wish to reiterate that while we are willing to try out the proposed procedures, the United States retains the option of relying on other legal processes available to us in gathering evidence. Such processes include our seeking the issuance of orders from our own courts commanding the production of evidence from persons or institutions in our territory.

Government Exhibit 3A.

Finally, the mechanism set forth in the gentlemen's agreement is not even applicable where the United States is concurrently investigating tax and narcotics laws violations. Governor Lloyd informed Michael Carpenter that "it is only fair to say that I do foresee difficulty [in] the type of case which is clearly criminal but also has tax prosecution possibilities." Joint Brief of the United Kingdom and the Cayman Islands, Appendix Y–2). Since the grand jury investigation in this case concerned both tax and narcotics violations it is clear that the gentlemen's agreement procedure was not applicable.[21]

The gentlemen's agreement procedure is a far cry from constituting a substantially equivalent alternative to a grand jury subpoena. The agreement represents nothing more than an understanding that informal requests for assistance would now be channeled between the Justice Department's Of-

fice of International Affairs and Cayman's Commissioner of Police. As Deputy Assistant Attorney General Olsen asserted, it would "violate good sense and reason" to forego the use of the subpoena power in these circumstances. Government Exhibit 3 at 5.

## IV. THE SINGLE CONVENTION ON NARCOTIC DRUGS

■ *Amici*, United Kingdom and the Cayman Islands, also contend that the subject subpoena is void because it was issued contrary to the provisions of the Single Convention on Narcotic Drugs, 1961. The district court concluded that:

> The Single Convention on Narcotic Drugs, 1961. 18 U.S.T. 1409, TIAS 6298, New York, March 30, 1961, ratified by the United States 1967, does not control the conduct of the parties to this case. It cannot be interpreted to require that the government make a showing of materiality and necessity to a party or issue letters rogatory when seeking to obtain documents located in another party's jurisdiction. It does not restrict the grand jury subpoena power. It does not contain exclusive means for the exchange of information between parties. *Cf., Vetco, supra,* 691 F.2d at 1285–1286.

Supplemental Record at 350–351.

We agree.

The primary purpose of the Convention was to simplify and rationalize the numerous existing treaties on the international control of production and commerce in narcotic substances. Its ultimate goal was to eliminate illicit drug trafficking. *See generally,* Cohrrsen and Hoover, The International Control of Dangerous Drugs, 9 J.Int.L. and Econ. 81, 83–85 (1974); Lande, The Single Convention on Narcotic Drugs, 1961, 16 Int'l.Org. 776 (1962).

To effectuate this goal, Article 35, entitled "Action against the illicit traffic", provides for cooperation by the signatory

---

**21.** It is also important to note that the informal procedure has not resulted in the expeditious production of bank records. John Harris stated that as of February 14, 1984, "no bank records have ever been received in any case by the United States in the fourteen months that the informal agreement has been under experiment, even though access to such evidence was one of the central aims of our discussions." Government Exhibit 4 at 7–8.

countries, "having due regard to their constitutional, legal and administrative systems." Under Article 36, the parties agree to provide criminal penalties for any drug transactions which are contrary to the provisions of the convention. The obligation of each party to provide these penalties is subject to the constitutional limitations and the legal system and domestic law of each signatory country. Thus, it is clear that the drafters of the Convention wanted to ensure that it was sufficiently flexible so as to be generally acceptable.

In *In re Baird*, 668 F.2d 432 (8th Cir.), *cert. denied*, 456 U.S. 982, 102 S.Ct. 2255, 72 L.Ed.2d 860 (1982), the court recognized that the Single Convention did not impair the investigatory powers granted to the grand jury under United States law. Similarly, in *In Re Nigro*, 555 F.Supp. 65 (D.Colo.), *aff'd*, 705 F.2d 1224 (10th Cir. 1982), *cert. denied sub nom*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), the court protected the integrity of the grand jury process by emphasizing that the Single Convention would not require the abrogation of the grand jury secrecy rule, and held that an immunized witness could be compelled to testify despite an alleged fear of foreign prosecution. These cases clearly establish that a country's obligations to cooperate under the Single Convention are governed by its own domestic law. The only logical interpretation of the Single Convention vis-a-vis existing law enforcement techniques is that the Single Convention was intended to encourage the expansion of available mechanisms for obtaining relevant information. It cannot be interpreted in a way that hinders, rather than aids, the enforcement of drug trafficking laws. *United States v. Liles*, 670 F.2d 989 (11th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Richardson*, 580 F.2d 946 (9th Cir.1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979).

The existence of the Single Convention on Narcotic Drugs does not require any greater deference to foreign law than that already recognized in the balancing test set forth in the Restatement. The requirement of international cooperation in Article 35 permits the United States to cooperate with "due regard" to its own legal system. The well-established legal system of the United States permits enforcement of grand jury subpoenas under the circumstances of this case. The Single Convention neither requires the United States to forego this method of obtaining records nor does it require the Cayman Islands to defer to it. The existence of the Single Convention does not restrict the grand jury's power in this case.

## V. THE ACT OF STATE DOCTRINE

▮ Only the United Kingdom asserts that the act of state doctrine should be applied here to thwart the efforts by the Executive Branch to obtain records in furtherance of a grand jury investigation into conduct crossing our nation's boundaries. The doctrine is completely inapplicable to this case. The act of state doctrine is primarily designed to avoid impingement by the judiciary upon the conduct of foreign policy by the Executive Branch. It is aimed at preventing judicial interference with the conduct of foreign relations by questioning the validity of the acts of foreign sovereigns in the context of a civil suit.[22] The doctrine is not required by considerations of sovereignty, international law or the Constitution. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421–27, 84 S.Ct. 923, 936–40, 11 L.Ed.2d 804 (1964); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 605 (9th Cir. 1976). Instead the doctrine "derives from the judiciary's concern for its possible interference with the conduct of foreign affairs by the political branches of the government." *Timberlane Lumber Co. v. Bank of America*, 549 F.2d at 605.

The Restatement's definition of the rule renders it completely inapplicable in the investigatory or criminal context:

**22.** As Commentary j to Restatement § 41 notes, the act of state doctrine is a variant of "conflict of law rules" for "settlement of civil litigation of a private nature."

Except as otherwise provided ... a court in the United States, having jurisdiction ... to determine a claim asserted against a person in the United States or with respect to a thing located there, or other interest localized there, will refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interests.

Restatement (Second) Foreign Relations Law of the United States § 41 (1965).

It is also inapplicable in this case because the Cayman Grand Court purported to control conduct in the United States by blocking compliance with the grand jury subpoena, whereas the classic formulation of the doctrine is set forth in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) as follows:

Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.

The district court correctly concluded that the doctrine had no application to this case.[23] The district court pointed out that it never "passed upon the validity of any act of a foreign state before issuing the April 27 order denying the Bank's motion to quash the subpoena and directing the Bank to comply with the subpoena." Supp.R. at 351. The court also never conducted an inquiry into the validity of a public act of a foreign sovereign. United States law does not require blindly giving effect to the act of a foreign sovereign without "having due regard ... to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

We have previously recognized that international friction is provoked by enforcement of subpoenas such as the one in this case. *In re Grand Jury Proceedings United States v. Bank of Nova Scotia*, 691 F.2d at 1388. But under our tripartite form of government federal courts remain open to the legislative and executive branches for assistance if matters such as this prove to have international repercussions. *See e.g., United States v. First National City Bank*, 379 U.S. 378, 384–85, 85 S.Ct. 528, 531–32, 13 L.Ed.2d 365 (1965). The grand jury is a centuries-old, common law institution which is vital to our system of government. It has both the right and the duty to inquire into the existence of possible criminal conduct. *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972). Indispensable to the exercise of its power is the authority to require the production of evidence. *United States v. Mandujano*, 425 U.S. 564, 571, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212 (1976). The district judge in this case was extremely patient. He gave the Bank ample chances to comply with the subpoena. But the Bank was just sloppy in its search. The remedy for violation of the district court's order is civil contempt. The imposition of a coercive fine is not improper, *In re Grand Jury Impaneled January 21, 1975*, 529 F.2d 543, 550–51 (3d Cir.), *cert. denied sub nom, Freedman v. United States*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976), and will be reversed only for an abuse of discretion. *See, e.g., United States v. Flores*, 628 F.2d 521, 527 (9th Cir.1980). The order of contempt and the

**23.** The court also pointed out that even if we were to assume that the act of state doctrine applied, this case would fall within the *Banco Nacional De Cuba v. Sabbatino*, 307 F.2d 845 (2nd Cir.1962) exception. The court stated:

[T]here was no danger in this case that enforcement of the subpoena would inpinge upon fundamental matters committed by the Constitution to other branches of government. The branch of government to which these matters of foreign policy are committed is the same branch seeking (and obtaining) enforcement of the subpoena. The court in *Sabbatino* observed that '... when the executive branch of our Government announces that it does not oppose inquiry by American courts into the legality of foreign acts, an exception to the judicial abnegation required by the act of state doctrine has arisen....' *Id.* at 857–858.

fine in this case did not constitute an abuse of the district court's discretion.

AFFIRMED.