**In re SEALED CASE (two cases).**

**Nos. 87-5208, 87-5209.**

United States Court of Appeals,
District of Columbia Circuit.

Argued July 2, 1987.

Decided Aug. 7, 1987.

---

Before WALD, Chief Judge, MIKVA and BORK, Circuit Judges.

Opinion Per Curiam.

PER CURIAM:

These consolidated appeals are taken from orders in a miscellaneous proceeding below collateral to a grand jury investigation. The government sought and obtained orders in the district court compelling appellants, a bank and an individual, to respond to a grand jury subpoena by producing documents and giving testimony. When appellants continued to refuse to respond to the grand jury's demands, the court found appellants in contempt. The grand jury investigation has not been completed, and the records in the district court and this court have been sealed. In order to maintain this secrecy, we do not identify the parties in this opinion. *See* Fed.R. Crim.P. 6(e).

## I.

There are two appellants in these appeals. Appellant in Number 87-5209 is a bank owned by the government of Country X. The bank does business in many countries around the world, including the United States and Country Y. Country Y is a foreign nation with banking secrecy laws that make it a criminal offense for a bank or a person to reveal to anyone other than the customer, information about banking transactions or bank documents created in Country Y that relate to the customer and his transactions.

Appellant in Number 87-5208 is an individual who is currently employed as the manager of the bank's agency in a city in the United States. The manager is a citizen of Country X, though he has significant family and property connections to Country Y. For several years in the early 1980s the manager was the assistant manager of the bank's branch in Country Y.

In the course of a grand jury investigation into an alleged scheme by a number of American citizens and business entities to launder money in violation of 18 U.S.C. § 371 (1982) and 31 U.S.C. § 5322 (1982), the United States Attorney for the District of Columbia issued a subpoena *duces tecum* to the manager and the bank. The subpoena sought bank documents created and held in the bank's branch office in Country Y which are believed to contain information concerning the illegal financial transactions. Many of the transactions documented by the subpoenaed papers were created while the manager was assistant manager of the branch in Country Y. In addition, he is a personal friend and has been a business associate of several of the targets of the grand jury investigation. The subpoena also sought, therefore, the manager's testimony about bank transactions and other matters of which he has personal knowledge. Neither the bank nor the manager is a target of the investigation or suspected of any wrongdoing.

From the beginning, the manager and the bank have cooperated to a certain extent with the investigation. The manager has come to Washington several times to meet with the prosecutors and testify before the grand jury about his knowledge of the targets and their activities that he learned in his personal capacity (not through bank operations). Except for information concerning three customers from whom they obtained releases, however, the manager and the bank refused to testify before the grand jury about the targets' banking activities or produce documents on the ground that to do so would violate Country Y's banking secrecy laws and subject the manager and the bank to criminal prosecution in Country Y.

The bank has taken the position that the government should use other means to attempt to obtain the documents from Country Y, a course that the government believes is inappropriate and would be inef-

fective. The manager based his refusal to testify on fifth amendment grounds, claiming that the act of testifying would subject him to criminal sanctions in Country Y. The government secured use immunity for the manager but he continues to decline to answer on the ground that a United States court could not immunize him from criminal prosecution in Country Y. Since the act of testifying would violate the laws of Country Y, he contends that to require him to testify would violate his fifth amendment protection against self-incrimination.

The government filed a motion in the district court seeking an order compelling both the bank to surrender the records and the manager to testify. The court conducted a hearing and issued an order on January 21, 1987, granting the government's motion. Through an inadvertence, neither the government nor appellants learned of the order until the time for compliance had passed. The court issued an amended order on March 12, 1987, setting a new date by which compliance must take place. Before the time to comply expired, the manager and the bank notified the prosecutor that they would not comply for the previously stated reasons.

The manager was called before the grand jury again on April 9, 1987, at which time he again read a statement declining to respond on fifth amendment and comity grounds—that to answer would violate the laws of Country Y and subject him and the bank to criminal prosecution there. The government then moved the district court to hold the bank and the manager in civil contempt. The court issued a show cause order on May 13, 1987. In an attempt to block further proceedings, Country X delivered a *note verbale* to the United States Department of State requesting that "no compelling means" be ordered against its bank.

The court conducted a hearing on the show cause order on June 5, 1987, and immediately issued an order holding appellants in civil contempt. To coerce compliance with its order, the court ordered that the bank be fined $50,000.00 per day and the manager be confined until they purged their contempt. The court entered a second order staying the sanctions pending appeal. Appellants noted their appeals from the orders compelling responses and the contempt order on June 8, 1987.[1]

## II.

■ The manager's fifth amendment claim is based on his assertion that Country Y could convict him of a crime solely for revealing information protected by Country Y's banking secrecy law. He does not claim that the substance of his testimony would incriminate him for any crime that he has committed, under either the laws of the United States, of Country X, or of Country Y. The manager argues that, despite the district court's grant of immunity, his real and substantial fear of prosecution in Country Y cloaks his refusal to testify with fifth amendment protection. We disagree.

1. This court entered an order setting an expedited briefing and argument schedule based on the requirement that "[a]ny appeal from an order of confinement under [the recalcitrant witness] section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal." 28 U.S.C. § 1826(b) (1982). Counsel for the bank has sent a letter to the Clerk citing case law from other circuits holding or stating that when the order of confinement is stayed, the thirty day time limit is inapplicable. *In re Grand Jury Proceedings re: Larson*, 785 F.2d 629, 631 n. 4 (8th Cir.1986); *In re Witness Before Special October 1981 Grand Jury*, 722 F.2d 349, 353 (7th Cir.1983); *In re Kitchen*, 706 F.2d 1266, 1271 n. 2 (2d Cir.1983); *In re Weiss*, 703 F.2d 653, 660 n. 6 (2d Cir.1983). Counsel also cites *In re Sealed Case*, 794 F.2d 749, 750–51

(D.C.Cir.1986), in which this court held that the thirty day time limit is not jurisdictional and that if the court takes more than thirty days, the witness need not be released from custody.

We held argument in this case on July 2, 1987, six days before the thirty day time limit was scheduled to expire. The issues in this case are ones of first impression and have required close scrutiny. Rather than "rush to judgment," we have taken more than thirty days to decide this appeal. At this time, however, we decline to rule that when a section 1826 confinement order is stayed pending appeal, the thirty day time limit does not apply. We recognize, however, that appeals from any orders under the recalcitrant witness statute must be given expedited treatment. 28 U.S.C. § 1657(a) (Supp. III 1985).

In *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Supreme Court held that the fifth amendment privilege against self-incrimination · must be deemed fully applicable to the States through the fourteenth amendment. In *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), decided the same day, the Court held that a state witness granted use immunity may not be compelled to testify unless the testimony and its fruits cannot be used against him in a federal prosecution.

The Supreme Court has not yet determined whether fear of prosecution by a foreign country is sufficient to invoke the fifth amendment. In *Zicarelli v. New Jersey Investigation Comm'n,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), the Court noted probable jurisdiction to consider this issue, but found it unnecessary to reach the constitutional question. The manager recognizes that *Murphy* did not expressly extend to foreign prosecutions, but argues that the Court expressly gave the privilege the same construction as the English courts did. *See* 378 U.S. at 77, 84 S.Ct. at 1608. "The [English] rule did 'protect witnesses against disclosing offenses in violation of the laws of another country.' *United States of America v. McRae,* [L.R., 3 Ch. App. 79 (1867)]." *Id.* at 72, 84 S.Ct. at 1065. Lower courts have been divided on this question. *Compare United States v. (Under Seal),* 794 F.2d 920 (4th Cir.) (fifth amendment only applicable if foreign jurisdiction has similar privilege), *cert. denied,* — U.S. —, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) *with In re Cardassi,* 351 F.Supp. 1080 (D.Conn. 1972) (values expressed by fifth amendment bar compulsion of testimony that could be used in any foreign prosecution). We find it unnecessary to resolve the issue in this case.

The district court concluded that even if the fifth amendment does apply to a situation in which the witness asserts the threat of foreign prosecution, it "[was] not convinced that the fear of prosecution in this case is 'real' as required by *Zicarelli v. New Jersey Comm'n of Investigation,* 406 U.S. 472, [478–81], 92 S.Ct. 1670, 1674–76, 32 L.Ed.2d 234 (1972)." *In re Grand Jury*

*Investigation,* Misc. No. 87–00003, mem. op. at 4 (D.D.C. Jan. 21, 1987). It based this finding on the strict secrecy provisions of Fed.R.Crim.P. 6(e).

We agree that the manager's fear of prosecution is not real, but for a different reason. The manager could only be prosecuted by Country Y as a result of his own voluntary act—returning to Country Y. We recognize his substantial connections to Country Y, but he no longer lives or works there. He is not himself a citizen of that country and his immediate family is with him in this country. As the manager concedes, the offense with which he could be charged by Country Y for his testimony here is not an offense for which he could be extradited. He could only be punished for this offense if he were to return voluntarily. "It is well established that the [fifth amendment] privilege protects against real dangers, not remote and speculative possibilities." *Zicarelli,* 406 U.S. at 478, 92 S.Ct. at 1674. We only add that it does not protect against dangers voluntarily assumed. We, therefore, affirm the order of the district court holding the manager in contempt for refusing to testify before the grand jury.

### III.

■ The bank argues that the district court erred in entering a civil contempt order that compels it to act in violation of the laws of Country Y. The federal courts have disagreed about whether a court may order a person to take specific actions on the soil of a foreign sovereign in violation of its laws and about what sanctions the court may levy against a person who refuses to comply with such an order. A line of older Second Circuit cases takes the position that a court should not order violations of foreign law on foreign territory. *See United States v. First Nat'l City Bank,* 396 F.2d 897, 901–02 (2d Cir.1968); *Inge v. Ferguson,* 282 F.2d 149, 152 (2d Cir.1960); *First Nat'l City Bank of N.Y. v. IRS,* 271 F.2d 616, 619 (2d Cir.1959), *cert. denied,* 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). Other cases distinguish between a court's ability to order a person to produce

documents in contravention of foreign law, which is thought to be acceptable, and its ability to impose sanctions for disobedience to that order, which is thought to be much more problematic. *See, e.g., In re Westinghouse Elec. Corp. Uranium Contracts,* 563 F.2d 992, 996–99 (10th Cir.1977); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 26–36 (S.D.N.Y. 1984); *cf. Societe Internationale v. Rogers,* 357 U.S. 197, 204–13, 78 S.Ct. 1087, 1091–96, 2 L.Ed.2d 1255 (1958). Two recent Eleventh Circuit cases, however, indicate that court's willingness to approve civil contempt orders and accompanying sanctions that seek to compel a person to violate foreign secrecy laws by producing documents that are located on foreign soil. *See In re Grand Jury Proceedings (the Bank of Nova Scotia),* 740 F.2d 817 (11th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985); *In re Grand Jury Proceedings,* 691 F.2d 1384 (11th Cir.1982), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *cf. United States v. Vetco Inc.,* 691 F.2d 1281 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

We do not here decide the general issue of whether a court may ever order action in violation of foreign laws, although we should say that it causes us considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question. Be that as it may, here we simply conclude that even if a court has the power to issue such contempt orders under certain circumstances, on the peculiar facts of this case the order should not have issued. Most important to our decision is the fact that these sanctions represent an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory. In addition, the bank, against whom the order is directed, is not itself the focus of the criminal investigation in this case but is a third party that has not been accused of any wrongdoing. Moreover, the bank is not merely a private foreign entity, but is an entity owned by the government of Country X. We recognize that one who relies on foreign law assumes the burden of showing that such law prevents compliance with the court's order, *see, e.g., Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1374 (10th Cir.), *cert. denied,* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978), but here the government concedes that it would be impossible for the bank to comply with the contempt order without violating the laws of Country Y on Country Y's soil. The district court specifically found that the bank had acted in good faith throughout these proceedings. The executive branch may be able to devise alternative means of addressing this problem, but the bank cannot.

The two cases in which the Eleventh Circuit has upheld civil contempt orders of this nature are distinguishable from the situation before us. In the first case, the contempt order was directed against an American entity, and there was a substantial dispute over whether that entity in fact exercised complete control over the documents that were being sought. Thus, there was considerable room for doubt whether enforcement of the order would require violation of foreign laws on foreign soil. *See In re Grand Jury Proceedings,* 691 F.2d at 1386–87. In addition, the trial court specifically found that the contemner had not made a good faith effort to comply with the subpoena. *Id.* at 1389. In the second case, the trial court also found that the contemner had not acted in good faith, but had undertaken an "extensive pattern of delay" in the *erroneous* belief that foreign law barred production of the documents in question. *See In re Grand Jury Proceedings,* 740 F.2d at 826. Even if the power to enter a contempt order like the one in this case is theoretically within a court's province, we think that the facts of this case do not warrant the exercise of such a troublesome authority.

A decision whether to enter a contempt order in cases like this one raises grave difficulties for courts. We have little doubt, for example, that our government and our people would be affronted if a foreign court tried to compel someone to

violate our laws within our borders. The legal expression of this widespread sentiment is found in basic principles of international comity. But unless we are willing simply to enter contempt orders in all such cases, no matter how extreme, in utter disregard of comity principles, we are obliged to undertake the unseemly task of picking and choosing when to order parties to violate foreign laws. It is conceivable that we might even be forced to base our determination in part on a subjective evaluation of the content of those laws; an American court might well find it wholly inappropriate to defer to a foreign sovereign where the laws in question promote, for example, torture or slavery or terrorism.

These kinds of concerns bring us very close to the act of state doctrine, which, though it arises in a different context, cautions courts not to "sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). Here, as there, we see good reason for courts not to act on their own, even at the urging of the executive branch, when their actions "may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964); *see also International Ass'n of Machinists and Aerospace Workers v. OPEC*, 649 F.2d 1354, 1358–59 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). We have no doubt that Congress could empower courts to issue contempt orders in any of these cases, or that the executive branch could negotiate positive agreements with other nations to the same end. If we were asked to act in accord with such a distinct and express grant of power, it would be our duty to do so. Indeed, any such measures would be a welcome improvement over the difficulties and uncertainties that now pervade this area of the law.

In sum, we emphasize again the limited nature of our holding on this issue. If any of the facts we rest on here were different, our holding could well be different. And though we reverse the district court's order holding the bank in civil contempt on the facts of this case, we of course intend no challenge to the proposition that the vital role of grand jury investigations in our criminal system endows the grand jury with wide discretion in seeking evidence. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). It is therefore also relevant to our conclusion that the grand jury is not left empty-handed by today's decision. The manager will be available and able to testify as to many of the facts that the grand jury may wish to ascertain. The government may find alternative means to obtain additional information from or through the bank. Though we recognize that the grand jury's investigation may nonetheless be hampered, perhaps significantly, we are unable to uphold the contempt order against the bank.

*Affirmed in part and reversed in part.*