**In re GRAND JURY SUBPOENA
DATED AUGUST 9, 2000**

**No. M 11–189.**

United States District Court,
S.D. New York.

Sept. 6, 2002.

James B. Comey, New York City, by Peter G. Neiman, Assistant United States Attorney, Philip E. Urofsky, Senior Trial Attorney, Department of Justice, for the Southern District of New York.

Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York City, by James E. D'Auguste, Mark J. MacDougall, Heather J. Pellegrino, for the Corporation.

Steptoe & Johnson, LLP, Washington, DC, by Reid H. Weingarten, Brian M. Heberlig, for the Republic.

### OPINION

CHIN, District Judge.

### (REDACTED) *

A grand jury in this district is investigating allegations that a New York corporation (the "Corporation") bribed senior officials in a foreign country (the "Republic") to help American companies secure the rights to the vast natural resources of that country. In particular, the grand jury is investigating whether the Corporation and its principal paid millions of dollars to high-ranking governmental officials of the Republic.

On August 9, 2000, the grand jury issued a subpoena directing the Corporation to produce virtually all of its business rec-

ords dating from 1991. Over time, the Corporation has produced a number of documents—some 300,000 pages—but has refused to comply fully. The Corporation argues that it need not produce the withheld documents because 1) approximately 1,100 responsive documents located in New York are protected by the Republic's executive privilege, and 2) none of the documents located in its offices in the Republic may be produced without violating Republic law. On May 1, 2002, the Government filed this motion to compel production of the remaining documents, wherever located, except those protected by the attorney client and work product privileges. The Corporation also filed a motion on June 3, 2002, and renewed it on July 19, 2002, for an order striking the case agent's ex parte affidavit, or directing its disclosure.

This case of first impression presents the question whether a grand jury investigating suspicions that an American citizen and corporation have bribed senior foreign officials may subpoena documents that (1) the subject nation asserts are within its executive privilege, and (2) are located, in part, abroad where production is prohibited—not just by local law, but by specific opinions rendered by high legal officials of the foreign country.

After weighing the conflicting interests at stake, I conclude that the grand jury is entitled to documents from all three of the Corporation's offices, including those located in the Republic, because the Government has overcome the asserted privilege, and the interest of the United States in enforcing its criminal laws outweighs any difficulties that the Corporation may face in complying with the subpoena in contravention of Republic law.

---

* This is a redacted version of an Opinion filed under seal. This matter is presently before the grand jury. The motion papers were sealed, and oral argument was heard in a closed courtroom. Accordingly, I have used pseudonyms and redacted or altered certain material to preserve the secrecy of the grand jury proceedings.

Accordingly, the Government's motion to compel is granted. The Corporation must comply with the August 9, 2000 subpoena and produce the documents from its offices in New York and the Republic.

## BACKGROUND

### A. The Parties

#### 1. John Doe

Doe, an American citizen, is the president and principal owner of the Corporation. He is a close advisor to senior officials in the Republic and has been appointed by the Republic as a special consultant to advise on commercial and economic affairs.

#### 2. The Corporation

The Corporation is a merchant banking firm, incorporated in New York, with its principal office in New York City. The Corporation also has offices in the Republic, and most of its employees there are citizens of the Republic. The Corporation has been appointed by the Republic to provide consultant services on strategic planning and attracting foreign investment.

#### 3. The Republic

The Republic is recognized by the United States and is considered to be an important ally of this country. The Republic is home to vast natural resources that have been the subject of a number of large investments by American companies in joint ventures with Republic-owned companies.

### B. The Investigation

The Government has been investigating Doe and the Corporation for several years. The grand jury that issued the August 9, 2000 subpoena is still in session. This proceeding is closed pursuant to Fed R.Crim. P. 6(e)(5).

The Government submitted an ex parte affidavit from the case agent describing the allegations in greater detail. The Corporation submitted the assertedly privileged documents from New York for the Court to review in camera.

### C. The Corporation and the Republic Respond to the Investigation

The Corporation asserts that it first learned of the investigation beginning in June 2000. The Corporation applied to the Ministry of Justice and the Supreme Court of the Republic "for formal clarification of the legal status of [Doe and the Corporation]" "with respect to anticipated efforts by U.S. authorities to obtain records." (Corporation Mem. at 4). Shortly thereafter, two of the highest ranking legal officials of the Republic issued a joint statement concerning the relationship among the Republic, Doe, and the Corporation. The joint statement recounts the various appointments granted to Doe and the Corporation, and summarizes that Doe "provided and continues to provide" "advice and counsel" to high officials on "issues pertaining to the development of trade" between the Republic and the United States. It states that "[a]ny communication between the Republic and Mr. Doe with respect to matters of State is part of the executive deliberative process of the executive power of the Republic." It further states that any such information is considered "highly confidential and under the protection of executive privilege."

Following the subpoena issued in August 2000, the Corporation again petitioned the Ministry of Justice for direction. (Corporation Mem. at 8). On December 15, 2000, Doe wrote to the Minister of Justice. (Corporation Mem. Ex. 13). Doe asked whether responsive documents in the Corporation's offices in the Republic "can, or should be submitted in response

to the subpoena." The letter asks for a determination whether the documents belong to the Corporation or to the Republic under Republic law, what jurisdiction the Republic maintains over them, and what "limitations" exist under Republic law that would prohibit transmission of the documents out of the country.

The Minister of Justice responded on January 25, 2001, opining that any information Doe possessed was considered "strictly confidential," "protected by the sovereign rights of the Republic," and "not subject to transfer to any third parties." The letter sets out seven paragraphs that describe Republic law forming the basis for the Minister's opinion. That law essentially forbids disclosure of information "connected with the interests of the State" or the "national interests" of the Republic in the development of its natural resources. The letter also points out that, under the agreement between the Corporation and the Republic, any transfer of information "is possible only with the agreement of the executive branch of the Republic." The Minister also notes that information concerning "official or commercial secrets" is protected "when this information has real or potential commercial value because it is not known by third parties." Finally, the Minister warns that no documents may be removed that contain "information of State importance," especially information "connected with the national interests," "without observing the procedures established" by Republic law.

Following a demand by the Government in March 2002 that the Corporation comply with the August 2000 subpoena, the Corporation petitioned the Ministry of Justice a third time. The Minister's response refers to Doe's letter of April 12, 2002 asking for clarification regarding civil and criminal penalties that may be imposed "in the event that documents were released from the Corporation's offices" in the Re-public and what "defense and/or exceptions exist." (Corporation Mem. Ex. 16). The letter, which attaches the relevant statutes from the January 2001 letter, instructs that criminal disclosures of state secrets may be punished by incarceration of up to three years, and generally that "information given to any party by the [Republic] that relates to the national interests of [the Republic] . . . cannot be removed from the territory . . . without the permission of the [Republic]." (*Id.*).

In addition to these responses to the Corporation, the Republic made efforts to persuade the United States Government to stop the investigation, including a personal appeal from high officials of the Republic to the United States Department of State. The Corporation and the Republic also sought, and were denied permission, to disclose the Government's motion papers in this case as part of an existing effort to lobby other executive agencies to halt the investigation. These efforts have not been successful.

**D. *The Subpoena***

The subpoena in question was served on the Corporation on August 11, 2000. It sought all documents from 1991 relating to a lengthy list of individuals and entities. The list includes Doe and the Corporation, several major American companies, and high officials of the Republic.

A number of documents were produced, but the Corporation has withheld those it contends are protected by the executive privilege of the Republic. The Corporation has submitted privilege logs for the documents in New York. It has not produced any documents from the Republic, nor has it provided privilege logs.

The Government filed this motion on May 1, 2002. The Republic sought and received permission to appear. I heard oral argument and took testimony from an

expert witness on international law on June 6, 2002.

## DISCUSSION

The Corporation and the Republic argue that the motion to compel must be denied because it seeks documents that are protected by the executive privilege of the Republic, and because that country's law—as specifically interpreted by its highest legal officials—prohibits disclosure. Accordingly, I must decide whether the grand jury is entitled to the information it seeks in light of the scope of the asserted privilege and the effect of the law of the foreign sovereign that has appeared in this case. Because I conclude that the appropriate course is to balance the relevant interests at stake, that analysis will follow a discussion of international comity and the executive privilege.

### A. *Applicable Law*

#### 1. *The Foreign Corrupt Practices Act*

Congress enacted the Foreign Corrupt Practices Act (the "FCPA") in 1977 to criminalize illicit payments to foreign public officials by United States businesses and individuals. 15 U.S.C. §§ 78m(b), (d)(1), (g)-(h), 78dd–2, 78ff (1997), amended by the International Anti–Bribery and Fair Competition Act of 1998, 15 U.S.C. §§ 78dd–1 to 78dd–3, 78ff. The FCPA makes it illegal to bribe foreign government officials to obtain or retain business, or to direct business to another person. 15 U.S.C. § 78dd–2(a).

In 1998, Congress amended the FCPA to implement the Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"), signed in December 1997. *See United States v. Kay*, 200 F.Supp.2d 681, 686 (S.D.Tex. Apr.18, 2002). The amendments expanded FCPA coverage to "any

person"—not just "issuers" or "domestic concerns" (defined as any American citizen, national or resident, or American corporation). 15 U.S.C. §§ 78dd–1 to 78dd–3. The 1998 amendments also removed the requirement—for issuers and domestic concerns—of a territorial connection to the United States. Under the FCPA, any United States person or entity violating the Act outside the United States is subject to prosecution, regardless of whether any means of interstate commerce were used. 15 U.S.C. §§ 78dd–1, 78dd–2; *see* U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States...."). Foreign officials who receive bribes are not covered by the FCPA, nor can they be prosecuted for conspiracy to violate it. *See United States v. Castle*, 925 F.2d 831, 831 (5th Cir.1991).

#### 2. *The Power of the Grand Jury*

The grand jury is a "constitutional fixture," "[r]ooted in long centuries of Anglo–American history." *United States v. Williams*, 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (citations and internal quotations omitted); *see Marc Rich & Co. v. United States*, 707 F.2d 663, 666 (2d Cir.1983). The grand jury process is marked by "1) its independence from the court's supervision; 2) its broad investigative powers; 3) the presumption of validity accorded its subpoenas; 4) the secrecy of its proceedings; and 5) its general freedom from procedural detours and delays." *Whitehouse v. United States Dist. Court for Dist. of R.I.*, 53 F.3d 1349, 1357 (1st Cir.1995) (citations and internal quotations omitted). "All are agreed that a grand jury has both the right and the duty to inquire into the existence of possible criminal conduct." *Marc Rich & Co.*, 707 F.2d at 665. The grand jury may investigate "merely on suspicion that the law is being

violated, or even because it wants assurance that it is not." *Williams,* 504 U.S. at 48, 112 S.Ct. 1735; *see Marc Rich & Co.,* 707 F.2d at 665–66 ("'A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed ....'") (quoting *United States v. Stone,* 429 F.2d 138, 140 (2d Cir.1970)). It operates unrestricted by the rules of evidence or familiar exclusionary rules. *See, e.g.,* Fed.R.Evid. 1101(d) (providing rules of evidence inapplicable to grand jury except as to privileges); *United States v. Calandra,* 414 U.S. 338, 346, 349, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (allowing evidence to be presented to grand jury despite prior violations of the Fourth and Fifth Amendment); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (allowing hearsay).

■ The scope of the grand jury's broad investigative powers is aptly described by "the longstanding principle that 'the public ... has a right to every man's evidence,'" *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (citations omitted). Well-established is "the policy that '[n]owhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena.'" *In re Grand Jury Proceedings,* 219 F.3d 175, 186 (2d Cir.2000) (quoting *In re Sealed Case,* 676 F.2d 793, 806 (D.C.Cir.1982)). The power of the grand jury, however, is not unlimited; a court asked to enforce a subpoena may "refuse to lend its assistance when the compulsion the grand jury

seeks would override" constitutional rights, or invade testimonial privileges. *Williams,* 504 U.S. at 48, 112 S.Ct. 1735.

■ In considering whether to enforce a grand jury subpoena, ex parte submissions are acceptable if necessary to maintain grand jury secrecy. *See In re John Doe, Inc.,* 13 F.3d 633, 636 (2d Cir.1994) ("where an in camera submission is the only way to resolve an issue without compromising a legitimate need to preserve the secrecy of the grand jury, it is an appropriate procedure"); *Marc Rich & Co.,* 707 F.2d at 670 (noting that although "in camera submissions of affidavits are not to be routinely accepted, an exception to this general rule may be made" to preserve grand jury secrecy).

### 3. *Act of State Doctrine*

■ The act of state doctrine counsels a court to avoid examining the validity of an official act of a sovereign state taken on its own soil.[1] *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."). The guiding principle of the act of state doctrine is that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). "The major underpinning of the

1. The doctrine has been described both as a principle of abstention and as a rule of decision. The Second Circuit, without deciding, recently noted this difference—the latter would require the court to issue a binding ruling on the merits. *Bigio v. Coca-Cola Co.,* 239 F.3d 440, 452 n. 7 (2d Cir.2000). *But see W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l,* 493 U.S. 400, 406, 110 S.Ct. 701,

107 L.Ed.2d 816 ("The act of state doctrine is not some vague doctrine of abstention but a *'principle of decision* binding on federal and state courts alike.'") (quoting *Sabbatino,* 376 U.S. at 427, 84 S.Ct. 923). The doctrine is not constitutionally mandated; it has been preempted by acts of Congress. *See, e.g.,* 9 U.S.C. § 15 (amending arbitration act to make doctrine inapplicable).

act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion); *see Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations.").

■ Under the doctrine, "the assessment of the validity of a foreign law is limited to its application within the sovereign's territory," *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 126 (2d Cir.2001), and where the relief sought or the defense interposed would require a federal court to declare invalid the foreign government's official act. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 405, 110 S.Ct. 701, 107 L.Ed.2d 816. The foreign government need not be party to the action; the doctrine may apply if the validity of acts of a foreign sovereign will be passed on by the court. *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 75–78 (2d Cir.1977).

### 4. *Executive Privilege*

Federal common law recognizes a variety of forms of "executive privilege" that protect governmental information from public disclosure. The Corporation and the Republic assert two forms of the privilege: the state secrets privilege and the deliberative process privilege.

■ The state secrets privilege is absolute, and it applies where "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *United States v. Reynolds,* 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (concerning demand for evidence in a federal tort claims action); *see Zuckerbraun v. Gen. Dynamics Corp.,* 935 F.2d 544, 546 (2d Cir.1991) (noting privilege "allows the government to withhold information from discovery when disclosure would be inimical to national security"). The privilege for military matters is "well established" but is "not to be lightly invoked." *Reynolds,* 345 U.S. at 7, 73 S.Ct. 528. In addition, "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Id.* at 7–8, 73 S.Ct. 528 (citations omitted). The state secrets privilege "may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir.1983).

■ Executive privilege also includes a general deliberative process privilege. This most commonly invoked form of executive privilege allows government officials "freedom to debate" policies in private. *In re Sealed Case (Espy),* 121 F.3d 729, 737 (D.C.Cir.1997). Like the state secrets privilege, the deliberative process privilege must be asserted by the head of the governmental agency, or an appropriately qualified designee, after personal review of the documents. *See Mobil Oil Corp. v. Dep't of Energy,* 520 F.Supp. 414, 416 (N.D.N.Y.1981). The documents to be protected must be identified and described, and the agency must provide "precise and certain" reasons for asserting confidentiality over the requested information.

*Id.; United States v. Davis,* 131 F.R.D. 391, 400, n. 5 (S.D.N.Y.1990).

■ The deliberative process privilege is qualified; it may be overcome by a showing of need, which is determined on a case by case basis.[2] The deliberative process privilege has even been called "discretionary," as a balancing of interests must occur to determine whether to apply it in the first instance, not just whether it has been overcome. *Texaco P.R. v. Dep't of Consumer Affairs,* 60 F.3d 867, 885 (1st Cir.1995) ("At bottom, then, the deliberative process privilege is a 'discretionary one.'") (citing *In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. 577, 582 (E.D.N.Y. 1979)). When the privilege is at issue, a court must consider "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Texaco P.R.,* 60 F.3d at 885 (citation omitted).

As a result, whether the showing needed to overcome the privilege is phrased as a balancing of interests or a showing of need, it is clear that "'where the documents sought may shed light on alleged government malfeasance,' the privilege is routinely denied." *Id.* (quoting *Franklin,* 478 F.Supp. at 582). When alleged misconduct is at issue, the analysis shifts, and "the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process." *Id.* (quoting *Bank of Dearborn v. Saxon,* 244 F.Supp. 394, 401–03 (E.D.Mich.1965)); *cf. In re Lindsey,* 158 F.3d 1263, 1272 (D.C.Cir.1998) ("When an executive branch attorney is called before a federal grand jury to give evidence about alleged crimes within the executive branch, reason and experience, duty, and tradition dictate that the attorney shall provide that evidence.").

■ The party asserting the privilege bears the burden of proof. *See In re Grand Jury Proceedings,* 219 F.3d 175, 182 (2d Cir.2000) (attorney client privilege); *In re Grand Jury Subpoenas dated March 9, 2001,* 179 F.Supp.2d 270, 283 (S.D.N.Y.2001) (same). The privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Int'l Bd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997) (quoting *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973)); *see also In re Grand Jury Subpoenas dated March 9, 2001,* 179 F.Supp.2d at 283; *In re Grand Jury Subpoena Duces Tecum Dated March 24, 1983,* 566 F.Supp. 883, 885 (S.D.N.Y.1983) ("Privileges are carefully and narrowly construed in the context of the subpoenas of a grand jury....").

■ Finally, "[c]ourts have long held that foreign governments are entitled to protect their executive deliberations." *LNC Invs. v. Republic of Nicaragua,* 96 Civ. 6360(JFK)(RLE), 1997 WL 729106, *3, 1997 U.S. Dist. LEXIS 18607, at *7 (S.D.N.Y. Nov. 21, 1997) (citing *Kessler v. Best,* 121 F. 439, 439 (C.C.S.D.N.Y.1903) and *Firth Sterling Steel Co. v. Bethlehem Steel Co.,* 199 F. 353, 355–56 (E.D.Pa. 1912)). International comity dictates that courts in this country give a foreign sovereign the same protection afforded to the executive branch of the United States.

### 5. *Foreign Law Prohibiting Production*

■ When a subpoena is directed at information abroad that is protected

---

**2.** Even the constitutionally based executive privilege afforded to presidential communications can be overcome in the context of the grand jury or criminal prosecution, on a sufficient showing of need and unavailability.

*United States v. Nixon,* 418 U.S. 683, 707–12, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Sealed Case (Espy),* 121 F.3d 729, 736–38 (D.C.Cir.1997).

against disclosure by foreign law, a court must examine the conflicting interests to determine whether to order compliance or excuse it. Like courts in other circuits, the Second Circuit applies a balancing test distilled from the Restatements of the Foreign Relations Law of the United States, and has endorsed consideration of the following factors:

> (1) the competing interests of the nations whose laws are in conflict, (2) the hardship of compliance on the party or witness from whom discovery is sought, (3) the importance to the litigation of the information and documents requested, and (4) the good faith of the party resisting discovery.

*Minpeco, S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y.1987); *see First Am. Corp. v. Price Waterhouse LLP,* 154 F.3d 16, 22 (2d Cir.1998) (citing *Minpeco* with approval).

The analysis is broad, and it may encompass additional considerations—whether they are enumerated separately or considered as part of the four *Minpeco* factors. *See, e.g., First Am. Corp.,* 154 F.3d at 22 (adopting four-part test and considering whether the subpoena is addressed to a party or non-party); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16 (S.D.N.Y.1984) (considering the five factors of the Restatement (Second) § 40, including vital national interests, hardship, location, nationality, and expectation of compliance, as well as good faith). This circuit employs the same analysis to decide whether to compel discovery and whether to impose sanctions for noncompliance. *See Minpeco,* 116 F.R.D. at 520 (noting that good faith is considered at both the order and the sanctions stage); *Banca Della Svizzera Italiana,* 92 F.R.D. at 117 n. 3.

■■■ The possibility of civil or criminal sanction will not necessarily prevent enforcement of a subpoena. *See* Restatement (Second) of the Foreign Relations Law of the United States, § 39–40 (1965). When the laws of two jurisdictions conflict, the court must balance the interests, including the respective interests of the states involved and the hardship that would be imposed upon the person or entity ·subject to compliance. The Restatement (Third) of the Foreign Relations Law of the United States, section 442(1)(c), further directs courts to consider the importance of the documents requested to the underlying litigation, the availability of alternative means of disclosure, and the degree of specificity of the request.

Most of the authority in the criminal context concerns subpoenas for records protected by foreign bank secrecy laws. Courts consistently hold that the United States interest in law enforcement outweighs the interests of the foreign states in bank secrecy and the hardships imposed on the entity subject to compliance. *See, e.g., United States v. Davis,* 767 F.2d 1025 (2d Cir.1985) (finding interest in enforcing criminal laws against fraud overcame Cayman Islands interest in bank secrecy); *United States v. First Nat'l City Bank,* 396 F.2d 897 (2d Cir.1968) (finding strong interest in grand jury investigation of antitrust violations); *SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111 (S.D.N.Y. 1981) (compelling production in regulatory action to enjoin violations of federal securities laws). *But see In re Sealed Case,* 825 F.2d 494, 499 (D.C.Cir.1987) (reversing contempt sanction against bank, stating "we should say it causes us considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question").

## B. *Application*

### 1. *Ex Parte Submissions are Appropriate*

The Corporation filed a motion on June 3, 2002, and renewed it on July 19, 2002, to strike the case agent's ex parte affidavit, or disclose it. That motion is denied.

The Court recognizes that the Corporation "cannot make factual arguments about materials they have not seen and to that degree they are hampered in presenting their case." *In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982). Nonetheless, courts may allow ex parte submissions as "a reasonable method" of resolving disputes without breaching the secrecy of grand jury proceedings. *Id.; see In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir.2000) (collecting cases). Such submissions are not limited, as respondents contend, to grand jury testimony or information directly elicited from grand jury witnesses. In *In re John Doe, Inc.*, 13 F.3d 633, 635 (2d Cir.1994), for example, the Government submitted "for in camera review an ex parte sealed affidavit of an FBI agent, which set out the factual basis for the government's invocation of the crime-fraud exception."

Maintaining the secrecy of the grand jury's investigation is important, and I perceive no corresponding need to allow respondents access to information. It is fundamental that the grand jury's "task is to conduct an *ex parte* investigation to determine whether or not there is probable cause to prosecute a particular defendant." *United States v. R. Enter., Inc.*, 498 U.S. 292, 298, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). "[T]he reasons for keeping a tight lid on in camera documents containing grand jury testimony and on evidence gathered during criminal investigations are legion and obvious." *In re Grand Jury Subpoenas*, 144 F.3d 653, 662 (10th Cir.1998); *see In re Grand Jury 95–1*, 118 F.3d 1433, 1439 (10th Cir.1997) ("Several well-established policies underlie the secrecy accorded to matters before the grand jury, including: preventing those persons who may be indicted from escaping; insuring that the grand jury enjoys unfettered freedom in its deliberations; preventing targets of the investigation from tampering with witnesses; encouraging witnesses to testify frankly and truthfully without fear of retaliation; and shielding those who are exonerated by the grand jury.") (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681–82 n. 6, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)).

### 2. *The Grand Jury Has the Power to Compel Production*

 The documents in New York and the Republic are subject to the jurisdiction of the Court. "The grand jury is an appendage or agency of the court," and "may investigate any crime that is within the jurisdiction of the court," not "limited to conduct occurring in the district." *Marc Rich & Co.*, 707 F.2d at 666–67 (compelling compliance by Swiss corporation found within the court's jurisdiction) (citations omitted). A witness summoned by the grand jury cannot "resist the production of documents on the ground that the documents are located abroad." *Id.* The test for production is "control, not location." *Id.*

Although the Corporation has insisted production is prohibited by Republic law—and has stated that its employees might have to spirit the documents out of a Republic government building with armed guards—there is no serious question at this time that the documents remain within their control. The documents are located in the private offices of an American corporation. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 205, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (holding

Swiss bank secrecy prohibition does not preclude finding of "control" for Fed. R.Civ.P. 34, distinguishing court order or prohibition from third party custody).

Power to issue the order is not in doubt. Rather, "[t]he critical question is whether the court should, as a matter of discretion, issue such an order." *Minpeco*, 116 F.R.D. at 520 (declining to exercise power in civil context).

### 3. *The Act of State Doctrine Does Not Apply*

■ The Republic argues that the act of state doctrine is dispositive in this case, as the Court may not inquire into the Republic's assertion that executive privilege and Republic law prohibit disclosure. (Republic Mem. at 11) ("pursuant to the act of state doctrine, the Court must deny the government's motion to compel"). I conclude that there is ample reason not to apply the doctrine in this case, both as a technical matter and based upon the underlying policies of the doctrine.

The first question a court must ask when a party raises the act of state doctrine is whether the doctrine is really in the case at all. In *W.S Kirkpatrick & Co.*, the unanimous Supreme Court held that "[a]ct of state issues only arise when a court must decide—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." 493 U.S. at 406, 110 S.Ct. 701. *W.S. Kirkpatrick & Co.* involved a suit by the losing bidder against the winner of a Nigerian government contract—a winner who pleaded guilty to violating the FCPA by bribing Nigerian officials. *Id.* at 402, 110 S.Ct. 701. The Court held that the doctrine may apply only when the relief would "require[ ] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory," and not merely when it would "embarrass" or "impugn" that sovereign. *Id.* at 402, 405, 110 S.Ct. 701.

Here, the act of state doctrine does not apply because this Court is not required to decide the validity of an official act of a foreign sovereign taken on its own soil. Instead, here, the sovereign nation has intervened in an American grand jury proceeding targeting an American citizen and an American corporation, seeking to prevent access to records in New York and in the New York corporation's offices in the Republic. Although the "acts" in question—the Minister's Declaration, for instance—presumably originated in the Republic, they were prompted by and are now being directed at a proceeding in the United States.

Even if the acts at issue can be seen as originating in the Republic, the intended effect is here in New York. That effect will be to deny the grand jury access to records of an American corporation based in New York. Thus, as a threshold matter, I conclude that the act of state doctrine is not applicable.

■ Assuming arguendo that the acts at issue are indeed "acts of [a] foreign sovereign[ ] taken within [its] own jurisdiction[ ]" that are being challenged in a United States court, this merely establishes that the doctrine is "technically available]." *W.S. Kirkpatrick & Co.*, 493 U.S. at 409, 110 S.Ct. 701. In this circuit, determining whether to proceed to apply the doctrine requires a balancing of the interests at stake; if the doctrine's underlying principles do not justify its application, it should not be invoked. *Bigio v. Coca–Cola Co.*, 239 F.3d 440, 452 (2d Cir.2000); *W.S. Kirkpatrick & Co.*, 493 U.S. at 406, 110 S.Ct. 701. The party moving for the doctrine's application bears the burden of proof. *Dunhill*, 425 U.S. at 694, 96 S.Ct. 1854; *Bigio*, 239 F.3d at 453.

In the Second Circuit, a court must weigh " 'the foreign policy interests that favor or disfavor [its] application.' " *Bigio*, 239 F.3d at 452 (quoting *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir.1986)). The goal of the balancing inquiry is to determine whether a separation of powers issue exists. "Act of state analysis depends upon a careful case-by-case analysis of the extent to which the separation of powers concerns on which the doctrine is based are implicated by the action before the court." *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 316 n. 38 (2d Cir.1981) (quoting *Dunhill*, 425 U.S. at 728, 96 S.Ct. 1854 (Marshall, J., dissenting)).

Here, the "major underpinning" that justifies invoking the doctrine is absent, for separation of powers concerns are not implicated. The act of state doctrine serves to caution a court to defer to the executive branch when it appears its decision will "embarrass or hinder the executive in the realm of foreign relations." *Bigio*, 239 F.3d at 452. This motion is brought by the executive branch itself, and granting the Government's motion merely ratifies the considered aims of the political branch. "The conduct of foreign relations is committed largely to the Executive Branch.... The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 114 (2d Cir.2001) (internal quotations omitted).

The Corporation and the Republic have raised the issue of whether the "line prosecutor" in this matter adequately represents the executive branch. (Corporation Mem. at 2). The Government provided a letter from Michael Chertoff, Assistant Attorney General in charge of the Criminal Division of the Department of Justice. (Gov't Reply Mem, Ex. A, *Chertoff* letter, May 31, 2002). The letter reiterates that the positions taken by the Government "represent the positions of the United States." That letter also confirms that "the Department of State and other appropriate parts of the Executive Branch have been aware of the nature of this investigation for more than two years, both because the Department of Justice consulted within the executive branch, and because the Republic itself has contacted the State Department regarding the investigation." *Id.*

To the extent that the investigation, aided by the enforcement of this subpoena, might embarrass the executive branch, or hinder its conduct of foreign relations—presumably because it risks angering an ever more important strategic ally over mere allegations bribery—it is not for this Court to prevent it. It is the executive's "independence the act of state doctrine primarily protects." *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 61 (2d Cir.1983) (enforcing civil investigation demands issued by the Justice Department over act of state objections).

Moreover, the expansive formulation of the act of state doctrine advocated by the Corporation and the Republic—that the doctrine should be applied when there is a risk of embarrassment—would make enforcement of the FCPA practically impossible. By definition, violations of the FCPA touch upon "official acts" of sovereign nations, and every investigation of a suspected violation of the FCPA has the potential to impugn the integrity of the officials of foreign sovereigns. Congress determined to enact the FCPA despite this probability, and has more recently expanded its reach to accord with international agreements the United States encouraged. *See United States v. Kay*, 200 F.Supp.2d at 686.

Thus, "the policies underlying the act of state doctrine [do] not justify its application" "even though the validity of the act of foreign sovereign within its own territory is called into question." *W.S. Kirkpatrick & Co., Inc.*, 493 U.S. at 409, 110 S.Ct. 701. To the extent the act of state doctrine does apply, I conclude that it merely binds the Court to accept 1) the assertions of the executive privilege of the Republic notwithstanding some apparent technical deficiencies, and 2) interpretations of Republic law put forward by its high legal officials. The legal significance of those actions, their weight, and the effect that they have in this proceeding are not determined by act of state analysis. That effect is determined by a balancing of the conflicting interests of the United States and the Republic, to determine whether to order compliance with the August 2000 subpoena or to excuse it.

### 4. *Executive Privilege*

First, as a preliminary matter, I discuss which law applies to determine the scope of the executive privileges at issue, and I conclude that federal (i.e., United States) law applies. Second, I conclude that the documents in question are not within the state secrets privilege, and third, to the extent that the documents are validly covered by the deliberative process privilege, I find the grand jury's need for the evidence overcomes it.

### a. *Federal Law Applies*

■ The Corporation and the Republic argue that Republic law should apply here and bar compliance with the subpoena. The Corporation urges that in light of the joint statement and the Ministry's opinion letters, Republic law operates to protect all of the records located in the Republic, as well as those identified in New York, as they concern matters of state importance. The Corporation and the Republic contend the materials sought by the grand jury are "state secrets" under Republic law and thus this Court should protect them as it would state secrets of the United States.

The Government responds to this argument with a discussion of Republic statutory law, but at this time I find this inquiry unnecessary. For now I assume that Republic law, if it were to apply, prohibits disclosing the information the grand jury seeks. *See In re Doe*, 860 F.2d 40, 47 (2d Cir.1988). ("Given our conclusion that the Philippine Constitution is inapplicable, it is unnecessary and inappropriate for us to resolve this question of Philippine law."); *Richmark Corp.*, 959 F.2d at 1474 (9th Cir.1992) (accepting contention that China's State Secrets Act barred disclosure, noting the court had "neither the power nor the expertise to determine for ourselves what PRC law is" and proceeding to balancing test); *but see, e.g., First Am. Corp.*, 154 F.3d at 21–22 (examining whether British confidentiality law at issue was absolute and noting exceptions).

I reject the proposition that foreign law ought to apply to a grand jury investigating violations of United States criminal laws and seeking information from a United States citizen and corporation. "Rule 501 requires the application of federal privilege law in criminal cases brought in federal court." *United States v. Gillock*, 445 U.S. 360, 368, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980); *see* Fed.R.Evid. 501 ("the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience").

I also reject the notion that international comity allows the Corporation to invoke an absolute privilege as defined by Republic law. Comity requires no greater protection for exchanges between Doe and Republic officials than for those of high-level

advisors—even legal advisors—to the president of the United States. *See In re Lindsey,* 158 F.3d 1263, 1278 (D.C.Cir. 1998) (noting the fact that *United States v. Nixon* announced a *qualified* privilege for presidential communications "severely undercuts the argument" for a stronger government attorney-client privilege). In discussing the level of protection to afford a United States president's legal advisors, the *Lindsey* court rejected the same arguments that the Corporation and the Republic advance. The court held: "A President often has private conversations with his Vice President or his Cabinet Secretaries or other members of the Administration who are not lawyers or who are lawyers, but are not providing legal services. The advice these officials give the President is of vital importance to the security and prosperity of the nation, and to the President's discharge of his constitutional duties. Yet upon a proper showing, such conversations must be revealed in federal criminal proceedings." *Id.* (citing *Nixon,* 418 U.S. at 713, 94 S.Ct. 3090; *In re Sealed Case (Espy),* 121 F.3d at 745).

### b. *State Secrets Privilege Does Not Apply*

■ The Corporation and the Republic argue that the absolute state secrets privilege protects the information sought by the grand jury. In essence, the Corporation and the Republic contend that the materials concern the Republic's international relations, and that the economic importance of natural resources to a developing country implicates national security concerns akin to those more traditionally subject to the privilege. These arguments fail, as the documents are not within the scope of the privilege, and the Corporation and the Republic have made no showing to merit an expansion of the privilege.

As discussed above, "[t]he state secrets privilege is a common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security." *Zuckerbraun,* 935 F.2d at 546 (citing *In re United States,* 872 F.2d 472, 474 (D.C.Cir.1989)). The Corporation and the Republic are correct that the information protected by the privilege is not confined to military affairs, but encompasses matters involving national defense, foreign policy, and foreign intelligence activities. *See In re "Agent Orange" Prod. Liab. Litig.,* 97 F.R.D. 427, 430 (E.D.N.Y.1983); *Nat'l Lawyers Guild v. Attorney Gen.,* 96 F.R.D. 390, 395 (S.D.N.Y.1982). "The various harms, against which protection is sought by invocation of the privilege, include impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg,* 709 F.2d at 57 (citing cases). *See also Halkin v. Helms,* 690 F.2d 977, 991 (D.C.Cir.1982) ("the privilege extends to matters affecting diplomatic relations between nations").

The state secrets privilege is rarely invoked, and the branch of the privilege that concerns diplomatic or international matters is the subject of even fewer cases. *See* 26 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* § 5668 (1992); *United States Steel Corp. v. United States,* 578 F.Supp. 409, 412 (CIT 1983) ("The privilege for state secrets is sometimes also expressed in terms of injury to foreign relations. Cases actually embodying this aspect of the privilege, without military or intelligence overtones, are infrequent.") (referring to *Republic of China v. Nat'l Union Fire Insurance Co.,* 142 F.Supp. 551 (D.Md.1956), as the "only case which actually discussed this aspect of the privilege, comparatively free of military or intelligence implications" and which concerned "the question of recognition of Communist China," a "matter[ ] of unusually sensitive foreign policy").

The diplomatic disruption contemplated, of course, refers to the interests of the United States. There is little case law on the issue of whether a foreign government can assert the privilege in the civil context, and apparently none in the criminal context. *See, e.g., Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 25 (S.D.N.Y.1984) (rejecting assertion of the state secrets privilege by plaintiff, a French-owned company, as outside the privilege's scope, and collecting cases concerning the United States interest). A court should not expand the privilege here to frustrate the aims of the executive branch, charged exclusively with this nation's diplomacy. Further, the contours of the privilege for state secrets are narrow, and have been so defined in accord with uniquely American concerns for democracy, openness, and separation of powers. Indeed, "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." *Halkin v. Helms,* 598 F.2d 1, 9 (D.C.Cir.1978) (quoting *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). This directive makes little sense in the present context. *See Phillips Petroleum,* 105 F.R.D. at 25 (noting that the "state secrets privilege ... should be narrowly construed to permit the broadest possible discovery consistent with the purposes of the privilege ... [which is] premised on a concern that any release of confidential government information to a coordinate and equal branch of government would offend the principle of separation of powers and be detrimental to the public interest.") (citations and internal quotations omitted).

Assuming the privilege is theoretically available and properly invoked, I am not persuaded that it applies.[3] As framed by the Republic, "[t]he large majority of withheld documents [in New York] reflect communications between Mr. [Doe] or [Corporation] employees and officials of the Republic relating to trade and economic relations between the Republic and the United States, including the promotion and facilitation of foreign investment in the economy of the Republic— matters that [high legal officials] have declared to be 'issues of state importance.' " (Republic Mem. at 8). The Corporation makes a similar argument, that "[i]nformation concerning ... natural resources is a matter of critical national security for the Republic" as its natural resource "diplomacy" has been "critical" to its development. (Corporation Mem. at 28). The Corporation contends that "release of these documents could disrupt the Republic's diplomatic relations" with a number of countries in the region. (*Id.*).

The Corporation provides no case law to support its position that these matters rise to the level of national security concerns. The Corporation correctly points out that the activity at issue is sovereign, and not purely commercial, *see, e.g., MOL, Inc. v. Peoples Republic of Bangladesh,* 736 F.2d 1326 (9th Cir.1984) (noting that the exploi-

---

**3.** The privilege must be formally invoked by the head of a department after personal review of the material at issue, a procedural safeguard that requires a determination that disclosure would irreparably impair national security. *See Landry v. F.D.I.C.,* 204 F.3d 1125, 1136 (D.C.Cir.2000). Here, only a "representative" of the Republic, perhaps counsel, reviewed the New York documents. Apparently no representative has reviewed the documents in the Republic. For the purposes of this motion, I assume that the documents in New York are representative of those in the Republic. *See Bareford v. Gen. Dynamics Corp.,* 973 F.2d 1138, 1142 (5th Cir.1992) (finding, in personal injury action regarding defective weapons system, where government does not target documents but objects to a claim that would require disclosure of sensitive information, agency head need only review "type of evidence" necessary to support claim).

tation of natural resources is a sovereign activity in the context of the Foreign Sovereign Immunities Act), but this standard is far different, and not all sovereign acts are protected as secret. Protecting all sovereign activity would greatly expand the state secret privilege. If the limited precedents available are instructive for any point, it is that the privilege is to be applied narrowly.

As discussed above, the privilege has not been applied in any analogous circumstance, and in each case where the privilege has been applied the courts found serious military or intelligence matters implicated. No court has granted our government or any other government the broad protection sought for the Republic here.[4] Accepting their characterization of the documents, I conclude the Corporation and the Republic have failed to demonstrate that disclosure to the grand jury is likely to *seriously disrupt* the Republic's international relations.[5] The consequences they suggest, in conclusory fashion, do not meet the high standard to merit the privilege's protection.

### b. *Deliberative Process Privilege is Overcome*

■ As for the deliberative process privilege, I assume that the documents are "deliberative"—that is, that they are "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."[6] *In re Sealed Case (Espy)*, 121 F.3d 729, 737 (D.C.Cir.1997). I conclude that, even if the documents at issue are covered by the privilege, the Government has made a sufficient showing of need to merit piercing the privilege.

The deliberative process privilege is routinely denied in the face of allegations of official misconduct. *In re Sealed Case (Espy)*, 121 F.3d at 737 ("where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government"). In its ex parte affidavit, the Government has provided ample support for overcoming the privilege. The Government's showing is sufficient to overcome even the constitutionally based presidential communication privilege, or the government attorney-client privilege, *see In re Lindsey*, 158 F.3d at 1272, which may be overcome by a showing of need and unavailability. There is no other source for the information, and it is not

---

4. Recent appellate cases illustrate the type of information protected. *See, e.g., Monarch Assur. P.L.C. v. United States*, 244 F.3d 1356, 1360 (Fed.Cir.2001) (barring discovery from the Government concerning whether individual employed by CIA); *Kasza v. Browner*, 133 F.3d 1159, (9th Cir.1998) (barring suit to enforce environmental protection laws on Air Force base); *Black v. United States*, 62 F.3d 1115, 1117 (8th Cir.1995) (barring disclosure of information concerning the identities of CIA agent as this would pose a "reasonable danger" to United States intelligence-gathering capabilities and diplomatic relations).

5. The Corporation submitted approximately 1,100 documents for the Court to review in

camera. For the reasons given herein, in camera review is not necessary. Nonetheless, the Court has reviewed a random sample of these documents, and they do not appear likely to disrupt the Republic's international relations or endanger its national security.

6. The Government objects that the Corporation has not met the technical requirements for asserting executive privilege, arguing that no appropriate Republic official has personally reviewed the documents and identified specific reasons why the documents are privileged. I do not decide the issue, as I assume the privilege has been properly invoked as a procedural matter.

disputed that the documents are relevant to the grand jury's inquiry.

## C. *The Government's Interest Outweighs Republic Law Prohibiting Disclosure*

 Having concluded that the documents at issue are not protected by any executive privilege, I must balance the conflicting interests of the United States, where a grand jury is seeking the Court's assistance to obtain the documents, and the Republic, whose laws I will assume prohibit providing them. After consideration of relevant factors to be applied in cases of jurisdictional conflict, I conclude that the Corporation must produce the records in question, notwithstanding a risk that doing so will subject it to criminal or civil penalties in the Republic.

### 1. *National Interests*

The first step in the analysis is to examine the competing interests of the United States and the Republic, and the extent that these interests will be furthered or impaired by an order compelling production.

The United States interest in enforcing its criminal laws is unquestionably strong. *United States v. Davis*, 767 F.2d at 1035 (collecting cases). In a criminal case brought by the Government, the Court owes "some deference to the determination by the Executive Branch—the arm of the government charged with primary responsibility for formulating and effectuating foreign policy—that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure." *Id.*

Specifically, the United States has a strong national interest in combating international bribery. The United States has been a leader in the international effort against it; Congress passed amendments strengthening the FCPA in 1998. Indeed, the resolution of this high profile investigation—which involves large suspected payments to the leaders of a foreign government—is important to both countries. American companies are among the largest investors in the Republic. At the same time, the Republic is widely perceived to suffer from corruption. Whether these perceptions are true, the Republic at least arguably shares the United States interest in combating bribery, especially as its economic growth depends upon international partnerships and trade in its developing natural resources. This alignment of interests distinguishes an FCPA investigation from other crimes where international discovery is sought.[7]

I accept that the Republic asserts a "fundamental national interest in protect-

---

7. There appear to be just two cases where such discovery was denied in the criminal context. Discovery was denied to a criminal defendant in *United States v. Rubin*, 836 F.2d 1096, 1102 (8th Cir.1988), which affirmed a district court quashing of a criminal defendant's subpoena for Cayman Islands banking records of a third party. The records sought were not in the control of a target of the proceeding, and were sought for a criminal trial, unlike the weight of the authority which concerns grand jury proceedings, which "maintain the secrecy of their proceedings, and therefore the foreign interest in protecting the privacy of bank customers is diminished." *Id.*

At the contempt stage, in *In re Sealed Case*, 825 F.2d 494 (D.C.Cir.1987), the court reversed a contempt order against a foreign bank that refused to comply with a grand jury subpoena. While expressing doubts about ordering the violation of foreign law on foreign soil, the court pointed out its holding was limited to the "peculiar" facts of the case, noting that "the bank, against whom the order is directed, is not itself the focus of the criminal investigation in this case but is a third party that has not been accused of any wrongdoing." *Id.* at 499.

ing the confidentiality of . . . issues of state importance." (Corporation Mem. at 14). The Minister of Justice has examined the relationship among Doe, the Corporation, and the Republic, and concluded that the records the Corporation possesses in that country that concern matters of state importance must not be disclosed. As discussed above, I defer to this opinion, and I give considerable weight to the Republic's interest in protecting the records of its consultants from disclosure, especially as those records concern matters of vital economic importance. In addition, I give substantial weight to the Republic's intervention in this matter, as contrasted to cases where "a foreign government's failure to express a view in such a context militates against a finding that strong national interests of the foreign country are at stake." *Minpeco,* 116 F.R.D. at 525. Nonetheless, these interests must be considered in the context of all the circumstances.

### 2. *Hardship to Parties or Witnesses*

I am not persuaded that Doe or any Corporation employee is likely to be prosecuted. *Minpeco,* 116 F.R.D. at 526. Notwithstanding the opinions of the Ministry of Justice, neither the Corporation nor the Republic has presented any evidence that the confidentiality asserted by the Republic is enforced by any active prosecution. For this reason, the law cited by Ministry of Justice "cannot be construed as a law intended to universally govern the conduct of litigation" in a foreign court. *Bodner v. Banque Paribas,* 202 F.R.D. 370, 376 (S.D.N.Y.2000) (declining to enforce French blocking statute); *cf. Reinsurance Co. of Am., Inc. v. Administratia Asigurarilor de Stat.,* 902 F.2d 1275, 1281 (7th Cir.1990) (noting, in evaluating hardship, evidence that the Romanian State Secrecy law is directed at domestic affairs and is vigorously enforced).

The Corporation may face some hardship. Many of the employees that would actually perform the production are Republic citizens, although Doe is an American and the Corporation is a New York corporation. Production of the documents will take place in the Republic, and this factor also weighs against ordering compliance. *See United States v. Chase Manhattan Bank, N.A.,* 584 F.Supp. 1080, 1086 (S.D.N.Y.1984). Courts have found this hardship mitigated, however, by noting that to some extent businesses that "serve two sovereigns" assume the risk of conflicting legal imperatives. *See id.* at 1086 n. 7 (quoting *United States v. First Nat'l City Bank,* 396 F.2d 897, 905 (2d Cir. 1968)). In addition, production of the documents is relatively straightforward, as the documents can be copied and shipped to the Corporation's New York offices, and thus there is "no need for a long and continuing course of conduct that the foreign jurisdiction might find offensive." *Chase Manhattan,* 584 F.Supp. at 1086.

### 3. *Importance of the Documents*

Based on the ex parte submission by the Government the documents appear to be highly relevant to the specific transactions under investigation by the grand jury. There is no alternative source of the documents.

### 4. *Good Faith*

An affirmative showing of good faith is required at the order stage. I find that the Corporation has "courted legal impediments" and does not appear to have genuinely attempted to comply. *Minpeco,* 116 F.R.D. at 528 (quoting *Societe Internationale,* 357 U.S. at 212, 78 S.Ct. 1087). Rather than use his significant influence to gain cooperation of Republic officials, Doe has sought advice from the Ministry of Justice intended to elicit support for re-

sisting anticipated subpoenas from the grand jury. (*See* Corporation Mem. Ex. 13, Dec. 15, 2000 Letter from J. Doe to Minister of Justice). In three letters to the Ministry of Justice, Doe asked whether responsive documents in the Corporation's offices in the Republic "can, or should be submitted in response to the subpoena" and suggests bases for non-compliance, including whether the documents belong to the Corporation or the Republic under the Republic's law, what jurisdiction the government maintains over them, and what "limitations" exist under the Republic's law that would prohibit transmission of the documents out of the country.

### 5. *Weighing of the Factors*

I conclude that, on balance, these factors favor ordering the Corporation to comply with the grand jury's subpoena. The Republic's interest in protecting governmental confidentiality is strong, and the interest cannot be more strongly asserted than by the appearance in this action by the Republic itself and several legal opinions by the Minister of Justice. I find, however, that the United States interest in investigating suspected violations of its criminal laws outweighs the Republic's interest. This calculus is especially important in an investigation of violations of the FCPA, as enforcement would be eviscerated if a foreign sovereign could intervene and thwart an investigation merely by asserting local secrecy law or executive privilege. A foreign government that is alleged to be a recipient of bribes from an American corporation cannot be permitted to bring a grand jury investigation to a halt, thereby undermining the FCPA, merely by declaring the American corporation's files off-limits.

### CONCLUSION

For the reasons set forth above, the Government's motion to compel is granted. The Government shall submit a proposed order, on notice, within five business days hereof, after conferring with counsel for the Corporation and the Republic in an effort to agree on language. If agreement cannot be reached, any objections to the Government's proposed order are to be submitted within two business days thereafter.

SO ORDERED.